¶ 10 Today, in *People v. Novotny*, 2014 CO 18, 320 P.3d 1194, 2014 WL 1045961, this court overturns the automatic-reversal rule of *People v. Macrander*, 828 P.2d 234 (Colo. 1992), and the more than 100 years of Colorado common law on which it was based. I understand the court in this case to say no more on this issue than it does in *Novotny*. Therefore, for the same reasons articulated in my dissent to *Novotny*, I respectfully dissent here too.

I am authorized to state that Justice HOBBS joins in the dissent.

2014 CO 18

**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Martin NOVOTNY, Respondent.**

**The People of the State of Colorado, Petitioner,**

v.

**Edward Arthur Vigil, Respondent.**

**Supreme Court Case No. 10SC377, Supreme Court Case No. 11SC509**

Supreme Court of Colorado.

March 17, 2014

Attorneys for Petitioner: John W. Suthers, Attorney General, Rebecca A. Jones, Senior Assistant Attorney General, Denver, Colorado.

Attorneys for Respondent Martin Novotny: Douglas K. Wilson, Public Defender, Karen Mahlman Gerash, Deputy Public Defender, Denver, Colorado.

Attorneys for Respondent Edward Arthur Vigil: Douglas K. Wilson, Public Defender, Michael C. Mattis, Deputy Public Defender, Denver, Colorado.

JUSTICE COATS delivered the Opinion of the Court.

¶ 1 The People petitioned for review of the court of appeals judgments reversing convictions in *People v. Novotny*, —— P.3d ——, —— No. 06CA2204, 2010 WL 961657 (Colo. App. Mar. 18, 2010), and *People v. Vigil*, No. 08CA1748, 2011 WL 1849617 (Colo.App. May 12, 2011) (not published pursuant to C.A.R. 35(f)). In each case, the intermediate appellate court applied a rule requiring automatic reversal as the remedy for any erroneous ruling on a challenge for cause adversely impacting the defendant's ability to shape the jury through peremptory challenges. In the former case, the district court denied a defense challenge to an assistant attorney general, on grounds that he was employed by a law enforcement agency, in response to which the defendant removed the prospective juror with a peremptory challenge and ultimately exercised all of his peremptory challenges. In the latter case, the district court granted a prosecution challenge for cause on grounds of bias, with the effect that the prosecution was able to exercise all of its peremptory challenges on other prospective jurors.

¶ 2 Today we overrule our prior holdings to the contrary and conclude in this consolidated opinion that reversal of a criminal conviction for other than structural error, in the absence of express legislative mandate or an appropriate case specific, outcome-determinative analysis, can no longer be sustained; and further, that allowing a defendant fewer peremptory challenges than authorized, or than available to and exercised by the prosecution, does not, in and of itself, amount to structural error. The judgments of the court of appeals in these two cases are therefore reversed.

I.

¶ 3 Martin Novotny was convicted of first degree murder and first degree burglary in connection with the death of his ex-girlfriend, and he was sentenced to life imprisonment without parole. He appealed his convictions to the court of appeals, contending among other things, that the district court had erroneously denied his challenge for cause to an assistant attorney general, thereby forcing him to expend one of his peremptory challenges to prevent that individual from sitting on the jury.

¶ 4 Edward Arthur Vigil was convicted of sexual assault on a child by one in a position of trust, as well as a separate offense of sexual assault on a child by one in a position of trust committed as part of a pattern of abuse, for abusing a teenage girl while she was a resident at the treatment facility where he worked. He was sentenced to concurrent, indeterminate terms of imprisonment of 15 years to life and 10 years to life. Vigil appealed his convictions to the court of appeals, contending that the district court erroneously granted two of the prosecution's challenges for cause, thereby effectively permitting the prosecution to exercise more peremptory challenges than authorized by statute and more than allowed of the defense.

¶ 5 In each case, the respective division of the court of appeals agreed with the defendant that the district court erred in ruling on a challenge for cause, and although the challenged prospective juror in neither case ultimately served on the jury, the defendant in each case was nevertheless disadvantaged by effectively receiving fewer peremptory challenges than authorized or than allowed of, and actually exercised by, the prosecution. In each case, the respective division applied

binding precedent of this court, requiring reversal without consideration of the likely impact of the error on the particular verdict at issue.

¶ 6 In both cases, the attorney general petitioned this court on behalf of the People, asking that we revisit the question of remedy for erroneous rulings on challenges for cause and expressly overrule our prior precedents that dictate automatic reversal. In addition, the People sought review of the court of appeals determination that the challenged assistant attorney general in *Novotny* was a paid employee of a law enforcement agency and therefore should have been removed for cause.

## II.

¶ 7 Criminal defendants in this jurisdiction are entitled to trial by an impartial jury of the county or district in which the offense was alleged to have been committed. Colo. Const. art. II, § 16. As we have noted elsewhere, "[t]he essential features of a jury trial lie in interposing between the accused and the accuser the common sense judgment of lay representatives of the community 'and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.'" *City of Aurora v. Rhodes*, 689 P.2d 603, 610 (Colo.1984) (quoting *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970)). Within constitutional limitations, the legislature determines the qualifications for jury service. *People v. White*, 242 P.3d 1121, 1124 (Colo.2010).

¶ 8 Section 105 of the Uniform Jury Selection and Service Act, §§ 13–71–101 to –145, C.R.S. (2013) (UJSSA), initially defines qualification for jury service in terms of citizenship and either residency or habitation in a particular county, but it then provides a number of specific conditions that will nevertheless disqualify an otherwise qualified prospective juror. Although a prospective juror may therefore be qualified in terms of citizenship and vicinage, he nevertheless "shall be disqualified" for failing to meet a number of other conditions related to such things as his age, facility with the English language, physical or mental capabilities, familial obli-

gations, and prior jury service. *See* § 13–71–105(2)(a)–(g), C.R.S. (2013). Whether and, if so, precisely how and when disqualification on the basis of any of these conditions must be asserted to avoid waiver has not yet been the subject of express determination by this court. *See White*, 242 P.3d at 1126; *but see* § 13–71–140, C.R.S. (2013) ("The court shall not declare a mistrial or set aside a verdict based upon allegations of any irregularity in selecting, summoning, and managing jurors, . . . or based upon any other defect in any procedure performed under this article unless the moving party objects to such irregularity or defect as soon as possible after its discovery and demonstrates specific injury or prejudice.").

¶ 9 Whether or not it must be raised in a particular manner, however, the absence of any qualification prescribed by statute to render a person competent as a juror is clearly designated cause for removal, on the basis of which a challenge by one of the parties must be sustained. *See* § 16–10–103(1)(a), C.R.S. (2013). Beyond the actual absence of some statutory qualification, the legislature has designated a number of other grounds that will also support a challenge for cause, generally involving such things as the prospective juror's relationship with the defendant or counsel, any prior adverse relationship with the defendant in a civil or criminal matter, prior juror service or service as a witness in a related matter, the existence of a fiduciary relationship with the defendant or a victim, the existence of enmity or bias toward the defendant, and employment by either a law enforcement agency or the public defender's office. § 16–10–103(1)(a)–(k). Apart from imposing a duty upon jurors to inform the court concerning any ground supporting a challenge for cause of which they are aware, whether asked about it or not, § 16–10–103(2), the statute also provides for the introduction of evidence of the "incompetency, disqualification, or prejudice of any prospective juror" who might otherwise appear to be qualified, competent, and unprejudiced, § 16–10–103(3).

¶ 10 In addition to challenges for cause, the legislature has also provided for a specific number of challenges, varying with the

nature of the charge and circumstances of the particular prosecution, to be exercised peremptorily. § 16–10–104, C.R.S. (2013). As the term implies, these challenges may, within constitutional limitations, be exercised without regard to or specification of any reason whatsoever. The statute further directs that such peremptory challenges are to be exercised as provided by applicable rule of criminal procedure. § 16–10–104(2). Rule 24(d) of the Colorado Rules of Criminal Procedure not only provides for the mechanics and timing of exercising peremptory challenges but also purports to permit the trial court to add peremptory challenges to either side, or to both sides, for good cause shown.

## A.

■ ¶ 11 With regard to Novotny's challenge to the assistant attorney general in his case, a trial court is therefore statutorily required to sustain a proper challenge for cause to a prospective juror who is a compensated employee of a public law enforcement agency. *See* § 16–10–103(1)(k); *see also* Crim. P. 24(b)(1)(XII) (similar but omitting the word "compensated"). On a number of occasions, we have addressed what unit of organization constitutes an employing "agency" for purposes of the statute and rule and, more particularly, when that agency amounts to a "law enforcement" agency. *See, e.g., People v. Speer*, 255 P.3d 1115 (Colo.2011); *Ma v. People*, 121 P.3d 205 (Colo.2005). Although the assessment of a prospective juror's employing agency may become more complex if he works in a subunit with traditional law enforcement duties operating within a broader organization or department that would not constitute a law enforcement agency, *see Speer*, 255 P.3d at 1121, the analysis is relatively straightforward with regard to employment with an umbrella organization or department that is itself a law enforcement agency.

¶ 12 While we have relied, in part, on the nature and characteristics of those entities designated law enforcement agencies by statute to develop a set of factors to be considered in determining whether particular *undesignated* public employers may also qualify as law enforcement agencies within the contemplation of the statute, *see Ma*, 121 P.3d at 211–12, we have never suggested that an entity actually designated a law enforcement agency by statute must additionally be evaluated according to these factors. Quite the contrary, if it were not already obvious, we have made abundantly clear that whenever an employing agency is statutorily designated a law enforcement agency, a challenge to a prospective juror on the basis of his employment must be sustained. *Speer*, 255 P.3d at 1121 ("[W]e have interpreted the statutory designation to include *not only* those agencies specifically identified *but also* other agencies performing similar functions." (emphasis added)).

■ ¶ 13 The office of the state attorney general has been specifically included in a number of different statutory provisions defining the term "law enforcement agency." *See, e.g.,* § 8–47–203.3(2), C.R.S. (2013) (" 'Law enforcement agency' includes ... the office of the state attorney general ...."); § 8–72–111(2), C.R.S. (2013) (same); § 24–50–127(2)(b), C.R.S. (2013) (same); § 26–1–114(3)(a)(III)(B), C.R.S. (2013) (same). Not only have we never implied that the statutory identification to which we referred should be limited to those entities designated as public law enforcement agencies specifically for purposes of section 16–10–103(1)(k), but we have in fact treated the office of the state attorney general as an archetype of a "law enforcement agency" in express reliance on the aforementioned statutory references. *See Speer*, 255 P.3d at 1121. Where the prospective juror's employer in this case had been both expressly identified as a law enforcement agency by statute and had been expressly acknowledged by this court in published opinions as a law enforcement agency, the defendant clearly had no obligation to produce additional evidence in support of his challenge. *Id.* ("Finally, *unless a public agency has already been identified as a public law enforcement agency by statute or the published case law of the jurisdiction*, a trial court cannot be expected to divine its nature as a law enforcement agency without having its primary function or purpose brought to the attention of the court." (emphasis added)).

## B.

¶ 14 With regard to remedy, the intermediate appellate court divisions in both *Novotny* and *Vigil* relied on a line of precedents of this court dictating reversal for any erroneous ruling on a challenge for cause adversely impacting the defendant's ability to shape the jury through peremptory challenges. In 1992, after what could only be described as less than consistent treatment in this jurisdiction of erroneous challenge-for-cause rulings, we looked back to the conceptual framework articulated in a civil case more than three-quarters of a century earlier, *see Denver City Tramway Co. v. Kennedy*, 50 Colo. 418, 117 P. 167 (1911), to assist us in formulating a firm rule requiring the reversal of any criminal conviction in which the defendant expends a peremptory challenge to remove a prospective juror, following an erroneous denial of his challenge for cause, and ultimately exhausts all the peremptory challenges available to him. *People v. Macrander*, 828 P.2d 234, 243 (Colo.1992). We reasoned, much as the *Kennedy* court had done some 80 years earlier, that in such a situation, the defendant has been forced to utilize one of his peremptory challenges to correct the trial court's error and as a result has fewer peremptory challenges available to exercise as he chooses. *Id.* We concluded that for this reason alone, he is impaired in his ability to change the ultimate composition of the jury. *Id.* at 244. Further finding that such a sequence of events affects a substantial right of the defendant, we held that it cannot be deemed harmless and therefore always merits reversal of an ensuing conviction. *Id.*

¶ 15 Eight years later, in the immediate wake of a contrary view taken by the United States Supreme Court, *see United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), we extended our finding of "inherent prejudice" beyond the erroneous *denial of defense challenges*, to also include the erroneous *grant of prosecution challenges*, reasoning that such error gives the prosecution an unfair tactical advantage. *See People v. Lefebre*, 5 P.3d 295, 308 (Colo.2000). In *Lefebre*, we distinguished *Martinez–Salazar* on the grounds

that enlarging the prosecution's capacity to shape the composition of the jury by effectively giving it more peremptory challenges presented an issue logically distinct from that addressed in both *Macrander* and *Martinez–Salazar*, as to which we found the latter Supreme Court opinion of little guidance. *Id.* We relied instead on an older judgment of this court as the model for resolving this logically distinct issue, *see Bustamante v. People*, 133 Colo. 497, 500, 297 P.2d 538, 540 (1956), in which we found inherent prejudice requiring reversal. More specifically, in *Bustamante*, we reasoned that affording the prosecution an additional peremptory challenge in this way, much as we would later reason in *Macrander*, "affected or could have affected the substantial rights of the defendant." *Id.*

¶ 16 In *Lefebre*, however, we also took the opportunity to distinguish *Martinez–Salazar* even from our treatment of the erroneous denial of defense challenges in cases like *Macrander*, and to offer an even firmer rationale for our automatic reversal rule, in terms of recent Supreme Court jurisprudence and the federal constitution. *See Lefebre*, 5 P.3d at 305. In addition to noting differences in the applicable federal and state rules of criminal procedure, we characterized *Martinez–Salazar* as setting forth a "narrow holding[ ]," standing for the proposition that the Fifth and Sixth Amendments are not violated when a defendant bears the burden of removing a juror whom the court should have removed for cause, through the exercise of a peremptory challenge. *Id.* at 307. We made clear, however, our understanding that, as the appellate review of a federal conviction, *Martinez–Salazar* left untouched the Court's earlier suggestion in *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), to the effect that "a defendant *does* suffer a Fourteenth Amendment due process violation if the trial court's actions deprive him of that to which he is entitled by state law regarding use of peremptory challenges." *See Lefebre*, 5 P.3d at 307 & n. 10 (emphasis added). Although we nowhere used the term "structural error," we clearly concluded that improperly impairing a defendant's capacity to use peremptory challenges to shape the ultimate composition

of the jury, guaranteed by state law, amounts to a violation of due process, as guaranteed by the federal constitution. *See id.*

¶ 17 Regardless of the merits of our reasoning in *Macrander* and *Lefebre* at the time, both federal and state law governing harmless error review in general, and the constitutional significance of peremptory challenges in particular, have developed so as to substantially erode the premises upon which those decisions rest, making their continued viability untenable. With regard to harmless error review, the jurisprudence of both this court and the United States Supreme Court distinguishing trial from structural error and defining "substantial rights" has evolved to the point of sanctioning reversal for trial error *only* when that remedy is dictated by an appropriate outcome-specific analysis. With regard to the constitutional implications of depriving a criminal defendant of state-granted rights to shape the jury through peremptory challenges, the United States Supreme Court has now expressly rejected the understanding we, and a substantial number of other jurisdictions, had of the federal due process implications of *Ross. See Rivera v. Illinois,* 556 U.S. 148, 157, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009) ("If a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern.").

¶ 18 The evolving decision to treat some kinds of error as harmless has been termed " 'the most far-reaching doctrinal change in American procedural jurisprudence since its inception.' " Wayne R. LaFave et al., *Criminal Procedure* § 27.6(a) (3d ed. 2013) (quoting Childress & Davis, *Federal Standards of Review* § 7.01 (2d ed. 1986)). Dominated at least as much by policy concerns as any consistent legal theory, the application of a harmless error rule has undergone substantial alternations, or refinements, in the jurisprudence of both this court and the United States Supreme Court. *See generally id.* § 27.6(b) ("Few areas of doctrinal development have been marked by greater twisting and turning than the development of standards for applying the harmless error rule.

Its history has been described as one 'of innovation and regression, of instability and uncertainty,' that cannot be explained in terms of any 'evolving progression of jurisprudential theories.' " (quoting Stephen A. Saltzburg, *The Harm of Harmless Error,* 59 Va. L.Rev. 988, 998 (1973))). By the time of our finding of "inherent prejudice" in *Macrander,* the mandate of Crim. P. 52(a) and C.A.R. 35(e) to disregard any error or defect not affecting substantial rights was already well-accepted, but the more precise distinction between trial error, which can be harmless, and structural error, which cannot, was yet in its infancy. *See Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (trial errors are compatible with harmless error analysis; structural errors are not); *see also Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (some constitutional errors may be deemed harmless).

¶ 19 For quite some time, the Supreme Court has characterized the federal harmless-error standard, grounded in both statute, 28 U.S.C. § 2111, and rule, Fed. R.Crim.P. 52(a), as requiring reversal *only* if the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (considering whether "the error had substantial and injurious effect or influence in determining the jury's verdict"). Although we have long cited *Kotteakos* with favor and interpreted the harmless-error standard of Crim. P. 52(a) similarly to the almost identical harmless-error standard of Fed.R.Crim.P. 52(a), we have, in the past, sometimes applied an outcome-determinative approach to the question whether an error affected the defendant's substantial rights, *see, e.g., People v. Quintana,* 665 P.2d 605, 612 (Colo.1983) (" [T]he appropriate question is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings."), and sometimes merely categorized the affected right as "substantial" based on the significance of the right itself, *see, e.g., Macrander,* 828 P.2d at 244; *Lefebre,* 5 P.3d at 304–05. And while intervening Supreme Court jurisprudence concerning nonconstitutional error appeared to

reject such "bright-line *per se* rules whether to conduct harmless-error analysis," *see* *United States v. Lane,* 474 U.S. 438, 448 n. 11, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (" [O]n its face, Rule 52(a) admits of no broad exceptions to its applicability. Any assumption that once a 'substantial right' is implicated it is inherently 'affected' by any error begs the question raised by Rule 52(a)."); *id.* at 474, 106 S.Ct. 725 (Stevens, J., dissenting) (reasoning, much as we would do in *Macrander* and *Lefebre*, that such bright-line rules should be retained where the impact of an error cannot be measured with precision), our case law failed to immediately appreciate or embrace this development.

¶ 20 Because the concept of structural error developed in the context of constitutional error, as a means of distinguishing those constitutional errors that could possibly be harmless from those that could not, *see* *Chapman,* 386 U.S. at 23, 87 S.Ct. 824, it was also not readily apparent that the structural error/trial error dichotomy was intended to apply to all trial error, whether of constitutional magnitude or not. If not before, at least by the Supreme Court's decision in *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), however, it had become clear that only this limited class of fundamental constitutional error, designated structural error, could " 'defy analysis by "harmless error" standards.' " *Id.* at 7, 119 S.Ct. 1827 (quoting *Fulminante,* 499 U.S. at 309, 111 S.Ct. 1246). Less than a year after deciding *Lefebre,* we partially came to grips with the effect of *Neder,* overturning our rule of automatic reversal for instructional mens rea omissions and instead analyzing them according to the outcome-determinative constitutional harmless error standard. *Griego v. People,* 19 P.3d 1, 8 (Colo.2001). Since that time we have regularly held, without fanfare, that only error rising to the level of structural error necessarily requires reversal. *See, e.g., Crider v. People,* 186 P.3d 39, 42 (Colo.2008); *Arteaga–Lansaw v. People,* 159 P.3d 107, 110 (Colo.2007). Similarly, since that time we have expressly recognized that the harmless-error standard of Crim. P. 52(a), which mandates that error be disregarded unless it affects substantial rights, requires some outcome-determinative analy-sis, evaluating the likelihood that the outcome of the proceedings in question were affected by the error. *Krutsinger v. People,* 219 P.3d 1054, 1063 (Colo.2009).

¶ 21 By current standards, the bright-line automatic reversal rules of *Macrander* and *Lefebre* could therefore survive only if the erroneous impairment of a defendant's ability to shape the jury through peremptory challenges were to fall within that limited class of error now designated structural error. Were the change in standards nothing more than a matter of nomenclature, we could simply recast those bright-line rules in modern terminology. But, in fact, the structural error/trial error dichotomy, to which we now firmly adhere, has greatly narrowed the class of error to which bright-line rules of reversal, which necessarily by-pass any outcome-determinative harmless error analysis, can apply. As we have often acknowledged, this limited class of error now comprehends only those defects affecting the framework within which the trial proceeds—errors that infect the entire trial process and necessarily render a trial fundamentally unfair—rather than simply errors in the trial process itself. *See id.* at 1058 & n. 1.

¶ 22 Whether or not the Fourteenth Amendment due process violation we mistakenly identified in *Lefebre* could have itself catapulted impairment of a defendant's ability to shape the jury into this limited class of fundamental constitutional errors, the Supreme Court has since made abundantly clear that no such due process protection exists for state-granted peremptory challenges. The Supreme Court has clearly retreated from various implications of earlier opinions, *see, e.g., Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894) (peremptory challenges characterized as "one of the most important of the rights secured to the accused"), and has now expressly rejected the notion that peremptory challenges have any constitutional dimension or purpose, other than as a means to achieve the end of an impartial jury, *Ross,* 487 U.S. at 88, 108 S.Ct. 2273 ("[P]eremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury." (internal citations omitted));

*Martinez–Salazar,* 528 U.S. at 311, 120 S.Ct. 774 (characterizing peremptory challenges as "auxiliary"); *Rivera,* 556 U.S. at 160, 129 S.Ct. 1446 (disavowing suggestion in *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), that denial or impairment of right to peremptory challenges was reversible error without specific showing of prejudice and emphasizing "'that the oft-quoted language in *Swain* ... was founded on a series of our early cases decided long before the adoption of harmless-error review.'" (quoting *Martinez–Salazar,* 528 U.S. at 317 n. 4, 120 S.Ct. 774)).

¶ 23 In *Rivera* the Court also expressly addressed the situation left open by *Ross,* whether a defendant who is deprived of what state law provides by virtue of a court's good-faith error suffers a Fourteenth Amendment Due Process violation. Rivera, 556 U.S. at 159–60, 129 S.Ct. 1446. Answering that question in the negative, the Court explained that it was not of constitutional significance that the defendant suffered a deprivation of his right under state law: "[E]rrors of state law do not automatically become violations of due process." *Id.* at 160, 129 S.Ct. 1446; *see also id.* at 158, 129 S.Ct. 1446 ("The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" (quoting *Spencer v. Texas,* 385 U.S. 554, 563–64, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967))). While we do not imply today that every violation of our statutes and rules prescribing the use of peremptory challenges must be disregarded as harmless, we are nevertheless unwilling to conclude that such violations of state law, as distinguished from an actual Sixth Amendment violation or those committed in other than good faith, *see id.* at 160, 129 S.Ct. 1446; *see also Martinez–Salazar,* 528 U.S. at 316–17, 120 S.Ct. 774, rise to the level of structural error.[1]

¶ 24 We are not unmindful that our holding today expressly overturns a bright-line rule initially imposed more than two decades ago; however, *stare decisis,* the

common-law principle requiring adherence by courts to decided cases, has never been an immutable law or inexorable command. *See People v. Blehm,* 983 P.2d 779, 788–89 (Colo. 1999); *Creacy v. Indus. Comm'n,* 148 Colo. 429, 433, 366 P.2d 384, 386 (1961). While it is a principle to be held in the highest respect, we have long made clear that we are not without the power to depart from our prior decisions when sound reasons exist for doing so. *Creacy,* 148 Colo. at 433, 366 P.2d at 386. Whether the highest court of any jurisdiction will choose to follow or depart from its own prior decisions must ultimately remain a matter of discretion. *See Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting).

¶ 25 Among the kinds of considerations we and the United States Supreme Court have identified as impacting a decision to depart from prior precedent are the practical workability of that decision; the extent to which a departure would work a hardship or inequity on those who have relied on and ordered their behavior around the prior ruling; and, importantly, whether the principles upon which the ultimate holding is premised, or related legal principles, have themselves developed in such a way as to leave the prior ruling without support. *See, e.g., Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 854–55, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). As a remedy for error rather than a rule involving duties or defenses, or defining error itself, the automatic reversal rule at issue here can be abandoned with little concern that by doing so we will unfairly upset settled expectations around which the behavior of defendants has been justifiably ordered. With regard to workability, for many of the same reasons that have led to the evolution of harmless error analysis generally, it can at least be said that this rule of automatic reversal has existed at a high cost, affording defendants, as it does, the opportunity to remove an objectionable juror by other means while simultaneously entitling them to reversal, should the trial court's

---

1. Nothing in our conclusion on the question of remedy jettisons the distinctions we have made in our case law between the right to exercise peremptory challenges and the Sixth Amendment right to a fair and impartial jury.

failure to remove for cause prove wrong, whether that lapse ultimately affects the verdict or not. Because the rule of automatic reversal applies with just as much force when the trial court erroneously removes a questionable juror at the prosecution's request and that action has the effect of upsetting the balance of peremptory challenges between the parties, the rule also tends to discourage courts from interpreting section 16–10–103(1) in favor of prosecution challenges for cause, knowing that any error in doing so will result in a reversal.

¶ 26 Most importantly, the evolution of legal principles in this area has not only left the doctrinal footings of this automatic reversal rule weaker; it has completely undercut them, leaving the rule itself without any theoretical support whatsoever. With the exception of express legislative mandate, *see, e.g., Zedner v. United States,* 547 U.S. 489, 507, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006); *see also* § 18–1–405, C.R.S. (2013), we have already made clear that reversal for trial error, based solely on the significance, or substantiality, of the affected right, can no longer be sustained. Because we alone can overrule our prior precedents concerning matters of state law, it is not merely within our discretion but in fact our obligation, when given the opportunity, to expressly overrule any of our prior holdings the necessary premises for which are no longer good law. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## III.

¶ 27 For these reasons, we overrule our prior holdings to the contrary and conclude that reversal of a criminal conviction for other than structural error, in the absence of express legislative mandate or an appropriate case specific, outcome-determinative analysis, can no longer be sustained; and further, that allowing a defendant fewer peremptory challenges than authorized, or than available to and exercised by the prosecution, does not, in and of itself, amount to structural error. The judgments of the court of appeals in these two cases are therefore reversed and the cases remanded to consider whether the error in each case was harmless under the proper outcome-determinative test.

JUSTICE HOOD concurs in part and dissents in part, and JUSTICE HOBBS joins in the concurrence in part and the dissent in part.

JUSTICE HOOD, concurring in part and dissenting in part.

¶ 28 Today, the majority overrules the automatic-reversal rule of *People v. Macrander,* 828 P.2d 234 (Colo.1992), and the more than 100 years of Colorado common law on which it was based. It does so because "the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern." *Rivera v. Illinois,* 556 U.S. 148, 157, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009).

¶ 29 That may now be true, but I fail to see how whether this is "a matter of federal constitutional concern" can dictate the proper remedy for the erroneous denial of a state-granted right. And the majority's emphasis on *Rivera* is puzzling, given the Supreme Court's explicit invitation to states "to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se.*" *Id.* at 162, 129 S.Ct. 1446. As I read *Macrander,* we have already made that decision. And if that decision were not explicit enough, I would accept the Supreme Court's invitation and make it so now.

¶ 30 Instead, the majority abandons *Macrander* in favor of a harmlessness standard—what it calls an "appropriate case specific outcome-determinative analysis"—under which a defendant must now show prejudice to obtain reversal. Maj. op. ¶¶ 2, 27. The majority fails to explain how a defendant can ever demonstrate prejudice under this standard, nor can I think of any examples.

¶ 31 Under the majority's approach, a defendant who uses a peremptory challenge to

cure a trial court's erroneous denial of a challenge for cause may never be able to demonstrate prejudice. This is because the defendant will have stricken the challenged juror. And if the defendant chooses not to use a peremptory, any error is arguably invited and not reviewable on appeal. The majority thus has replaced *Macrander*'s rule mandating automatic reversal with a rule seeming to mandate automatic affirmance.

¶ 32 Because this new rule has no place in our jurisprudence, especially in light of our long-standing history of safeguarding a criminal defendant's right to use the full complement of statutorily mandated peremptory challenges, I respectfully dissent from sections II.B and III of the majority opinion.

## I. The Significance of the Statutory Right Must Be Considered in Fashioning the Remedy for Its Violation

¶ 33 The peremptory challenge is " 'one of the most important rights secured to an accused,' the erroneous deprivation of which 'must be condemned.' " *Macrander*, 828 P.2d at 243 (quoting *Pointer v. United States*, 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894)).

¶ 34 "Voir dire is a very short window of time for attorneys and the court to determine whether a juror will be unbiased and impartial." *State v. Mootz*, 808 N.W.2d 207, 225 (Iowa 2012). During that short window, attorneys must detect the subtle biases and unaccountable prejudices of potential jurors, all while knowing that jurors are "less than candid when asked directly about their beliefs and attitudes, particularly in front of strangers in a group setting." Thomas A. Mauet, *Trial Techniques* 44 (8th ed. 2010).

¶ 35 The peremptory challenge thus helps to assure "the selection of a qualified and unbiased jury" by permitting counsel—acting on instinct, cryptic comments, and nonverbal cues that often evade the record—to strike jurors who survive legal challenges for cause but who nonetheless may not be fair to both sides. *See Holland v. Illinois*, 493 U.S. 474, 484, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990); *Commonwealth v. Hampton*, 457 Mass. 152, 928 N.E.2d 917, 927 (2010) (recognizing the "time-honored importance of peremptory challenges" because of the need to "eliminate those jurors perceived as harboring subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge," often based on "no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' " (quoting *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, 514 (1979))). Because it "plays a unique role in our legal tradition," an erroneous denial of a peremptory challenge requires "a unique remedy." *Mootz*, 808 N.W.2d at 225.

¶ 36 We recognized the need for this unique remedy in *Macrander*. In that case, we held that the trial court's erroneous denial of a challenge for cause, which resulted in the defendant's use of a peremptory challenge to cure the error, "affect[ed] a substantial right of the defendant and cannot be deemed harmless error." *Macrander*, 828 P.2d at 244. We characterized the error as "the denial of a statutory right," and we were careful to distinguish the separate issue of whether the jury "was impartial in the constitutional sense of that term." *Id.* at 243, 244 n. 12 (quoting *Denver City Tramway Co. v. Kennedy*, 50 Colo. 418, 423, 117 P. 167, 169 (1911)). In other words, our holding was based on the observation that the error impairs the defendant's ability "to change the ultimate composition of the jury," despite the right's statutory origins. *Id.* at 244. The majority now overturns *Macrander*, which was supported by reasoning we described as "unassailable" less than twenty-five years ago and reaffirmed less than ten years later. *See id.* at 243; *People v. Lefebre*, 5 P.3d 295, 308 (Colo.2000). As recently as 2007, we proclaimed: "An essential component to ensuring a balanced and impartial jury is allowing a defendant the full use of his peremptory challenges." *Dunlap v. People*, 173 P.3d 1054, 1081 (Colo.2007) (citing *Macrander*, 828 P.2d at 242–43).

## II. States Are Free to Forge Their Own Paths

¶ 37 What has changed since *Macrander*, *Lefebre*, and *Dunlap*? The majority points to two developments in the law.

## A. *Rivera*

¶ 38 First, the majority notes that, since *Rivera*, the Supreme Court awards peremptory challenges no "constitutional significance." Maj. op. ¶ 17. This observation is based on *Rivera's* holding that "the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern." *Rivera*, 556 U.S. at 157, 129 S.Ct. 1446. The majority then appears to reason that the right's lack of constitutional significance means that it is no longer "substantial" enough to warrant automatic reversal.[1]

¶ 39 But we have never held that the right was "substantial" because it was constitutional. Nor have we ever equated the "substantiality" of this right with the source from which it is derived. In *Macrander*, we deemed the right "substantial" because it plays a "significant role" in jury selection and is necessary to secure a defendant's right to a balanced and impartial jury. 828 P.2d at 242–43.

¶ 40 Moreover, the majority fails to recognize, much less grapple with, *Rivera's* invitation "to decide, as a matter of state law, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se*." 556 U.S. at 162, 129 S.Ct. 1446. As "a matter of state law," we have already settled this issue

in *Macrander*: the error "cannot be deemed harmless." 828 P.2d at 244. If *Macrander* were not explicit enough, I would accept the Supreme Court's invitation and make it so now, as several other states have done. *See, e.g., Mootz*, 808 N.W.2d at 225 (noting that "states have continued to apply an automatic reversal rule grounded in state law" following *Rivera*); *Hampton*, 928 N.E.2d at 926–27 (continuing to adhere to the view that "the erroneous denial of a peremptory challenge requires automatic reversal" due to the importance of peremptory challenges under state law); *People v. Hecker*, 15 N.Y.3d 625, 917 N.Y.S.2d 39, 942 N.E.2d 248, 272 (2010) (finding "no basis to depart from ... existing precedent" in light of *Rivera's* invitation); *State v. Yai Bol*, 190 Vt. 313, 29 A.3d 1249, 1255–56 & n. 3 (Vt.2011) (reaffirming automatic-reversal rule).

## B. The Evolution of Structural Error Analysis

¶ 41 The second change identified by the majority is the evolution of the Supreme Court's framework for evaluating "trial errors," which can be harmless, and "structural errors," which cannot.[2] Maj. op. ¶ 18. The majority appears to reason that, even assuming a right is "substantial," the Supreme Court has made clear that all errors must be evaluated in light of the trial record, unless

---

1. The majority opinion does not reach the distinct issue of whether a *Batson* violation constitutes structural error requiring automatic reversal. *See People v. Wilson*, 2012 COA 163, ¶¶ 20–28 (reasoning that *Batson* violations affect "the framework within which the trial proceeds" and holding that they are structural errors requiring automatic reversal (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991))).

2. "Trial errors occur 'during the presentation of the case to the jury' and do not require reversal to comport with due process" but rather "may be assessed under either harmless or plain error analysis." *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001) (quoting *Cooper v. People*, 973 P.2d 1234, 1242 (Colo.1999)). This is because they can be "quantitatively assessed in the context of other evidence presented." *Fulminante*, 499 U.S. at 308, 111 S.Ct. 1246. If a proper objection is made, then the error is reviewed for harmlessness. An error is harmless if "a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not sub-

stantially influence the verdict or impair the fairness of the trial." *People v. Stewart*, 55 P.3d 107, 124 (Colo.2002) (quoting *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo.1989)). If no objection is made, then the error is reviewed for plain error. A plain error is an error that is obvious and substantial and so undermines the fundamental fairness of the trial so as to cast serious doubt on the reliability of the conviction. *People v. Miller*, 113 P.3d 743, 750 (Colo.2005).

Structural errors, by contrast, "are not amenable to either a harmless error or a plain error analysis because such errors affect 'the framework within which the trial proceeds,' and are not errors in the trial process itself." *Griego*, 19 P.3d at 7 (quoting *Bogdanov v. People*, 941 P.2d 247, 252–53 (Colo.1997)). They "defy harmless-error review" because they "infect the entire trial process" and necessarily render it fundamentally unfair. *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

I interpret the majority's "appropriate case specific outcome-determinative analysis" to mean nothing more than a harmless error or a plain error analysis.

the error belongs to that "limited class of fundamental constitutional error" that defies harmless error analysis. *Id.* ¶ 20.

¶ 42 As the majority notes, however, this framework had existed for more than a year when *Macrander* was decided. And we recognized as much when we held that the error in that case "cannot be deemed harmless." *Macrander*, 828 P.2d at 244. Perhaps, as the majority surmises, "our case law failed to immediately appreciate or embrace this development." Maj. op. ¶ 19. But even if we were bound by the Supreme Court's interpretation of the federal harmless error standard when interpreting our own, which we are not, its interpretation "does not mean that all nonconstitutional errors must be subject to harmless-error analysis." *See United States v. Lane*, 474 U.S. 438, 472, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (Stevens, J., concurring in part and dissenting in part). This point is compelling where, as here, we are tasked with determining the proper remedy for the denial of a state-granted right—especially one that enjoys the venerable history in Colorado that peremptory challenges do.

### III. This Error Defies Harmless Error Analysis

¶ 43 The majority overturns *Macrander* and replaces it with an "appropriate case specific outcome-determinative analysis," under which a defendant must show prejudice to obtain reversal. In my view, this analysis is inappropriate for a simple reason: the error, by its nature, defies harmless error analysis. Although this characteristic suggests that the error is "structural," we need not focus on the label. Instead, we should focus on the futility of using a harmlessness standard. *Rivera* supports such an approach. It does not refer to "structural error" but instead acknowledges that states may find, as a matter of state law, that the error is "reversible error *per se.*" *Rivera*, 556 U.S. at 162, 129 S.Ct. 1446.

¶ 44 To determine whether an error was harmless, a reviewing court must consider whether the error, in light of the entire record at trial, substantially influenced the verdict or impaired the fairness of the trial.

*Davis v. People*, 2013 CO 57, ¶ 13, 310 P.3d 58.

¶ 45 Applying that standard here seems virtually impossible. If a defendant chooses to use a peremptory challenge to correct a trial court's erroneous denial of a challenge for cause, then any error is necessarily harmless, because, under the majority's reasoning, the error could not influence the verdict or impair the fairness of the trial. This is so despite our long-standing recognition that the defendant's ability "to change the ultimate composition of the jury" is unquestionably impaired. *See Macrander*, 828 P.2d at 244. Although I perceive no analytical basis for this distinction, perhaps the majority's holding is limited to cases, such as those before the court here, where the defendant effectively has received one fewer peremptory challenge than the prosecution. Cases in which there is a greater disparity may require a different result. But this demonstrates the slippery slope on which the majority places us. Is it an imbalance of two? Ten? Does the size of the gap matter at all?

¶ 46 And consider what appellate review of this error would actually look like. The reviewing court would be forced to focus not on the court's erroneous denial of a challenge for cause—which the defendant would have corrected through the use of a peremptory challenge—but on the general attributes of the jurors who ultimately decided the case. That analysis, apart from being inherently conjectural, *see Mootz*, 808 N.W.2d at 225, would be further complicated by well-established law restricting inquiry into the validity of verdicts, *see* 22 Stephen A. Hess & Sheila K. Hyatt, *Colorado Handbook on Evidence* 131 (2013) (noting that CRE 606(b) "broadly precludes most inquiries into a juror's mental states or processes").

¶ 47 Of course, a defendant might choose to forgo using a peremptory challenge and let the trial court's erroneous for-cause ruling stand. This way, the defendant would likely be able to show prejudice because a biased juror actually sat on the jury. And the Supreme Court has seemingly sanctioned this approach, stating that, after objecting to the trial court's denial of a for-cause challenge, the defendant has "the option of let-

ting [the juror] sit on the petit jury and, upon conviction, pursuing a Sixth Amendment challenge on appeal." *United States v. Martinez–Salazar,* 528 U.S. 304, 315, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). But under Colorado law, not only does such an approach create ethical and effective-assistance-of-counsel concerns, it arguably raises the specter of invited error, which precludes appellate review of any error the defendant "invited or injected into the case." *People v. Wittrein,* 221 P.3d 1076, 1082 (Colo.2009) (quoting *People v. Zapata,* 779 P.2d 1307, 1309 (Colo.1989)). In such a situation, a defendant who permits a biased juror to sit on the jury may have to "abide [by] the consequences of his acts." *Id.* (quoting *Zapata,* 779 P.2d at 1309).

¶ 48 Presumably, this is why the majority does not provide any examples of how a defendant would ever be able to show prejudice. The majority cites no authority from other jurisdictions finding reversible error under its approach. And my research reveals none.

¶ 49 Ostensibly, the majority leaves intact the right to use the full complement of statutorily mandated peremptory challenges; in fact, they leave defendants without a meaningful remedy whenever that right is denied.

### IV. The "Cost" of *Macrander* Is Overstated

¶ 50 The majority supports its decision to overturn *Macrander*'s automatic-reversal rule by noting that it has exacted a "high cost." Maj. op. ¶ 25. I am not convinced that *Macrander* is the minefield the majority makes it out to be.

¶ 51 The issue of automatic reversal under *Macrander* typically flows from the trial court's erroneous denial of a challenge for cause based on some form of bias. Usually, there is a debate about whether (1) a prospective juror is actually biased because he or she has a general predisposition to acquit or convict (the issue in Vigil's case)[3]; or (2) a juror is impliedly biased because he or she is a compensated employee of a "public law enforcement agency" (the issue in Novotny's case).[4]

¶ 52 In the first situation, trial courts enjoy broad discretion because they are in the best position to assess a potential juror's demeanor, credibility, and sincerity. *Dunlap,* 173 P.3d at 1082. For this reason, appellate courts afford "great deference" to a trial court's handling of for-cause challenges predicated on actual bias. *Morrison v. People,* 19 P.3d 668, 672 (Colo.2000). Trial courts regularly and appropriately deny these challenges for cause, and those decisions are often affirmed on appeal because of this deference. *See, e.g., People v. Fleischacker,* 2013 COA 2, ¶¶ 7, 20, 28, —— P.3d ——, 2013 WL 174442.

¶ 53 By contrast, the second situation does not require trial courts to assess a potential juror's demeanor, credibility, and sincerity. Instead, trial courts must construe a statute or related rule of criminal procedure to determine whether the juror falls within a statutorily defined category of implied bias. Appellate courts afford this determination no deference because it presents a question of law subject to de novo review. But we have given this category increasingly conspicuous boundaries. For instance, we have defined a "law enforcement agency" as a "police-like division of government that has the authority to investigate crimes and to arrest, to prosecute, or to detain suspected criminals." *Ma v. People,* 121 P.3d 205, 211 (Colo.2005). And today, we hold unanimously that *Ma*'s more idiosyncratic analysis for "*undesignated* public employers" is superfluous when the legis-

---

**3.** Section 16–10–103(1)(j), C.R.S. (2013), governs actual bias. It states that the court shall sustain a challenge for cause on the following ground: "The existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state; *however, no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impar-*

*tial verdict according to the law and the evidence submitted to the jury at the trial."* (Emphasis added.) *See also* Crim. P. 24(b)(X).

**4.** Section 16–10–103(1)(k), C.R.S. (2013), governs this category of implied bias. It states that the court shall sustain a challenge for cause when "[t]he juror is a compensated employee of a public law enforcement agency or a public defender's office." *See also* Crim. P. 24(b)(XII).

lature has designated an entity to be a law enforcement agency. Maj. op. ¶ 12. If that were not enough, the court of appeals has devoted considerable resources to help trial courts identify which government agencies constitute public law enforcement agencies. *See People v. Romero*, 197 P.3d 302, 307 (Colo.App.2008) (listing published cases).

¶ 54 In short, Colorado law has developed since *Macrander* to reduce the likelihood that its remedy will prove necessary. By overruling *Macrander*, we jettison this development. This too has a cost.

¶ 55 Before today, *Macrander*'s threat of automatic reversal helped to ensure that trial courts carefully scrutinized for-cause challenges, whether based on actual or implied bias. I fear that the majority has created a recipe for far less vigilance. At the very least, our trial judges and court of appeals are left guessing as to how they might give this new rule any teeth.

### V. Conclusion

¶ 56 I agree that the office of the state attorney general is a "law enforcement agency" and thus concur in section II.A of the majority opinion. But for the reasons stated, I respectfully dissent from sections II.B and III of the majority opinion.

I am authorized to state that Justice HOBBS joins in the concurrence in part and the dissent in part.