Opinion by JUDGE WEBB
¶ 1 A jury convicted James Jud Bondsteel of multiple offenses, including second degree kidnapping, aggravated robbery, unlawful sexual contact, and attempted sexual assault. On appeal, he challenges several pretrial rulings, raises arguments about proceedings during trial, and disputes the sufficiency of the evidence. We reverse one of the second degree kidnapping convictions for insufficient evidence, vacate the sentence imposed on that count, and remand for correction of the mittimus. In all other respects, we affirm.
I. Background
¶ 2 The trial court joined two separate cases against Bondsteel for trial: the Signal Mountain Trail case and the motorcycle case. In the Signal Mountain Trail case, the prosecution's evidence showed that Bondsteel had attacked two women while they were hiking, injuring one woman with a knife and moving her clothing before the other woman struck him and they escaped. In the motorcycle case, the evidence showed that Bondsteel, while on his motorcycle, approached four women in three separate cars and, sometimes at gunpoint, took their cell phones and other belongings. He also demanded that the women move or remove portions of their clothing and expose their breasts or genitalia.
II. Misjoinder
¶ 3 Bondsteel first contends the trial court erred in allowing the prosecution to join, over his objection, the Signal Mountain Trail case and the motorcycle case for trial under Crim. P. 13. We conclude that because Bondsteel failed to renew his objection or move to sever the cases at trial, he has failed to preserve this issue. But exercising our discretion under C.A.R. 1(d) to review Bondsteel's claim on the merits, we further conclude that his contention fails.
A. Preservation
¶ 4 Relying on People v. Gross, 39 P.3d 1279 (Colo. App. 2001), Bondsteel asserts that he preserved the misjoinder issue with an objection when the prosecution sought pretrial joinder of these cases under Crim. P. 13. The Attorney General responds that Gross was wrongly decided and Bondsteel waived this issue by failing to renew his objection, move to sever, or otherwise reaffirm his position at trial. Bondsteel's reply brief addresses the substance of alleged misjoinder at length but does not respond to the waiver argument.
¶ 5 The record confirms that Bondsteel did not take any action concerning alleged misjoinder between his pretrial motion and the verdict. Still, accepting the Attorney General's position on waiver would require us to depart from Gross . For the following reasons, we hold that Bondsteel at least forfeited this issue.
1. Law
¶ 6 Preservation is a threshold question. See Blueflame Gas, Inc. v. Van Hoose, 679 P.2d 579, 586 (Colo. 1984) ("[W]e must consider as a threshold matter whether [the party's arguments below] were adequate to preserve the issue ... for appellate review.").
¶ 7 Crim. P. 13 permits a court to try multiple indictments, informations, or complaints together on the motion of any party if the offenses "could have been joined in a *887 single indictment, information, complaint, or summons and complaint." This rule must be read in conjunction with Crim. P. 8(a)(2), which allows permissive joinder of offenses in an indictment or information if the charges "are of the same or similar character or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." But if a joint trial will prejudice either the defendant or the prosecution, the court may-on motion or sua sponte-sever the counts into separate trials under Crim. P. 14.
¶ 8 Our supreme court has directly addressed the interplay among these rules in only two cases.
¶ 9 In People v. Barker, 180 Colo. 28, 33, 501 P.2d 1041, 1043 (1972), the court explained that the defendant's "failure to renew the motion for severance at the close of all the evidence constitutes a waiver of the objection." There, three separate informations had been joined over the defendant's objection, and the court had denied a motion for separate trials. Id. at 30, 501 P.2d at 1041-42. The defendant did not renew his objection or move to sever at trial, however, and the original motion to sever was missing from the record. Id. at 33, 501 P.2d at 1043.[1]
¶ 10 Similarly, in People v. Aalbu, 696 P.2d 796, 806 (Colo. 1985), the court held that when a pretrial motion to sever a charge-which was added to the information by amendment-is denied, the defendant must renew the motion during trial or the misjoinder claim is waived. The court explained that the reason behind the renewal requirement is "to alert the court to the necessity of reconsidering its original decision in light of the evidence presented at trial and to permit the defendant to reevaluate the issue of prejudice." Id.[2]
¶ 11 Despite Barker, which involved an unsuccessful objection to consolidation, in Gross, 39 P.3d at 1281-82, the division declined to apply the renewal requirement where the defendant had objected before trial to the prosecution's motion to consolidate under Crim. P. 13, but he had not moved to sever. The division equated objecting to a motion to consolidate with a motion in limine, in which "the objector is entitled to assume that the trial court will adhere to its initial ruling and that the objection need not be repeated." Id. at 1281 ; cf . CRE 103(a)(2) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").
¶ 12 Further distinguishing between a defendant's objection to joinder under Crim. P. 13 and the defendant's motion to sever under Crim. P. 14, the Gross division explained that the two rationales expressed in Aalbu (noted above) as underlying the renewal requirement for motions to sever are inapplicable to an objection to joinder because Crim. P. 33(a)[3] "allows the appellate court to review the trial record for prejudice." Gross, 39 P.3d at 1282.
¶ 13 In Gross, the division did not address Barker . It distinguished Aalbu based on the differing burdens applicable to the parties: when a defendant objects to the prosecution's motion to join, as occurred in Gross, "the prosecution rather than the defendant was the moving party with the burden of proof." Id. at 1281. But when a defendant makes a *888 motion to sever, as in Aalbu, the defendant has the burden. Id.
¶ 14 Some divisions of this court have accepted Gross, but with little further analysis. See People v. Curtis, 2014 COA 100, ¶ 12, 350 P.3d 949 ; People v. Barrus, 232 P.3d 264, 269 n. 1 (Colo. App. 2009) ; People v. Owens, 97 P.3d 227, 231 (Colo. App. 2004) ; People v. Dembry, 91 P.3d 431, 435 (Colo. App. 2003).[4] Even so, "[o]ne division of this court is not bound by the decision of another division." People v. Moore, 321 P.3d 510, 513 (Colo. App. 2010), vacated in part on other grounds, 2014 CO 8, 318 P.3d 511. Still, the later division should give the prior decision some deference. People v. Smoots, 2013 COA 152, ¶ 20, 396 P.3d 53 (cert. granted in part on other grounds June 30, 2014).
¶ 15 For our part, such deference does not extend to following decisions that would be difficult to reconcile with opinions of our supreme court. Cf . People v. Washington, 2014 COA 41, ¶ 27, 345 P.3d 950 ("To the extent that several divisions of this court have departed from Strickland 's above-noted statements regarding the applicable burden of proof, we are not obligated to follow those divisions....") (citations omitted). Thus, for the following reasons we depart from Gross .
2. Application
¶ 16 First, we agree with the Attorney General that Gross creates "a distinction without difference." Rowe v. Mulvane, 25 Colo.App. 502, 508, 139 P. 1041, 1043 (1914). To illustrate this point, the Attorney General describes three similar procedural settings, but with differing preservation requirements under Gross :
• The prosecution brings multiple charges in one information against a defendant under Crim. P. 8(a)(2). The defendant moves to sever under Crim. P. 14, but the court denies the motion. Under Aalbu, the defendant must renew his motion to sever at trial to preserve it for appellate review.
• The prosecution brings charges separately against a defendant but later requests joinder under Crim. P. 8(a)(2) and Crim. P. 13. The defendant does not object and the cases are joined, but the defendant later moves to sever under Crim. P. 14. Again, Aalbu requires the defendant to renew the motion to sever at trial.
• The prosecution requests to join two cases under Crim. P. 13, the defendant objects, and the court grants the prosecution's request. The defendant does not move to sever. Under Gross, the defendant need not renew the objection at trial to preserve this claim.
¶ 17 Under Gross, the requirements to preserve are different for an objection to a motion to join and a motion to sever. But the practical effect of a preservation requirement during trial is the same-alerting the trial court to the defendant's position at that time and obtaining a ruling not based on the pretrial record.
¶ 18 Second, and given this similar practical effect, we disagree with the Gross division that the rationales for renewing a motion to sever do not equally favor renewing an objection to the prosecution's motion for joinder. As Aalbu, 696 P.2d at 806, explained, renewing a motion to sever alerts the court that it may need to reconsider its earlier ruling in light of the evidence at trial. And since "the considerations that apply" when a defendant objects to joinder "are essentially the same as when a defendant moves to sever charges originally joined," 5 Wayne R. LaFave et al., Criminal Procedure § 17.3(a), n.7 (3d ed. 2007), the court will similarly need to be alerted to reconsider its pretrial decision to join.
¶ 19 Likewise, insuring that the defendant has the opportunity to "reevaluate the issue of prejudice and to elect to proceed with a consolidated trial despite the risk of prejudice," Aalbu, 696 P.2d at 806 (citation omitted), is equally important whether the defendant moves to sever or objects to a motion to join. "The decision to seek severance *889 is likely to be based on tactical factors, often involving complex considerations." People v. Weese, 753 P.2d 778, 779 (Colo. App. 1987).
¶ 20 In either scenario, a defendant faced with an adverse pretrial ruling could "have his cake and eat it too." People v. Eppens, 979 P.2d 14, 22 (Colo. 1999). This is because "the defense may have strategically changed its position during the course of the proceeding based upon a perception that developments had redounded to its advantage." State v. Walker, 140 Ohio App.3d 445, 748 N.E.2d 79, 87 (2000). But requiring a defendant to renew the objection to joinder at the close of evidence "prevent[s] a defendant from deliberately failing to make a meritorious motion and waiting to see what verdict the jury returns." United States v. Terry, 911 F.2d 272, 277 (9th Cir. 1990).
¶ 21 Third, the disparate preservation requirements turn on charging decisions, yet charging decisions are largely within the prosecution's discretion. See, e.g., In re 2010 Denver Cty. Grand Jury, 2012 COA 45, ¶ 24, 296 P.3d 168 ("[P]rosecutors enjoy wide discretion to file charges or refuse to charge for reasons other than the mere ability to establish guilt.") (citation omitted).
¶ 22 Consider the facts of Aalbu, 696 P.2d at 806, to demonstrate this point: the prosecution added a charge to an existing information, but the defendant failed to renew his motion to sever at trial, waiving his claim. Had the prosecution filed a second case and requested joinder instead of amending the information to add a charge, the defendant would not have been required to renew his objection under Gross . Thus, the measure of the defendant's preservation requirements turns on the prosecution's discretionary charging decision, not on the practical effect of the prior rulings or the rationales announced in Aalbu .
¶ 23 Fourth, the Gross division did not explain, nor can we discern, why who has the burden of proof should determine whether a defendant must renew his joinder objection to preserve the issue for appellate review. Regardless of who bears the burden, because Crim. P. 13 is "[s]ubject to the provisions of [Crim. P.] 14," similar prejudice considerations control an objection to joinder as well as a motion for severance. And an appellate court would review both rulings for an abuse of discretion. See People v. Gregg, 298 P.3d 983, 985 (Colo. App. 2011) ("The decision to consolidate cases is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion."); People v. Pasillas-Sanchez, 214 P.3d 520, 530 (Colo. App. 2009) (concluding that the trial court did not abuse its discretion when it denied the defendant's motion to sever certain counts).
¶ 24 Fifth, the motion in limine rationale-that a party should be entitled to presume a trial court will adhere to a pretrial ruling-would apply to denying a motion for severance no less than to overruling an objection to joinder. "Under the law of the case doctrine, prior relevant rulings made in the same case are generally to be followed." People v. Young, 2014 COA 169, ¶ 39, 412 P.3d 676.
¶ 25 Sixth, "[t]he purpose of a Crim. P. 33 motion is to allow the trial court an opportunity to correct its errors." People v. Lopez, 2015 COA 45, ¶ 62, 399 P.3d 129. But once the trial has ended, the reason for reminding the trial court of its pretrial ruling-as noted in Aalbu -has diminished considerably. The Gross division did not cite authority, nor are we aware of any in Colorado, relying on the now-relaxed standard of Crim. P. 33(a) to relieve a defendant from the consequences of failure to raise an issue during trial. For example, where an alleged instructional error was not raised at trial, "raising it for the first time in a new trial motion was too late to avoid the plain error standard." People v. McNeely, 222 P.3d 370, 375 (Colo. App. 2009), overruled on other grounds by Gibbons v. People, 2014 CO 67, 328 P.3d 95 ; accord People v. Goldfuss, 98 P.3d 935, 939 (Colo. App. 2004).
¶ 26 Finally, neither Gross nor its progeny comport with out-of-state authority. Although similar cases are few, they disfavor the holding in Gross. See, e.g., State v. Hillman, 26 N.E.3d 1236, 1248 (Ohio Ct. App. 2014) ("Because appellant did not renew his objection to joinder of the charged offenses *890 at the close of the presentation of the state's evidence or at the close of the presentation of all evidence, he has waived all but plain error."); Spicer v. State, 12 S.W.3d 438, 444 n.7 (Tenn. 2000) ("Because the appellant in this case did renew his objection to consolidation after the State's proof and again in his motion for new trial, he thereby properly preserved his objection for appeal.").
¶ 27 In sum, we decline to follow Gross . Instead, under the rationale of Aalbu, because Bondsteel did not renew his objection to the People's motion to join at trial, his misjoinder claim is at best unpreserved. But the harder question is whether to apply this holding and decline further review.
B. Merits
¶ 28 In Barker and Aalbu, the supreme court held that the misjoinder issue had been waived. Where a defendant has waived a right, there is no error or omission by the court, leaving nothing for an appellate court to review. People v. Abeyta, 923 P.2d 318, 321 (Colo. App. 1996), superseded by rule on other grounds as stated in People v. Roy, 252 P.3d 24, 27 (Colo. App. 2010).
¶ 29 But Barker and Aalbu were decided three decades ago or more. Their use of "waiver," where the defendants merely failed to renew an objection or move to sever, would be difficult to reconcile with more recent precedent. See, e.g., People v. Rediger, 2015 COA 26, ¶ 54, 411 P.3d 907 ("In United States v. Olano, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Court distinguished between 'forfeited' and 'waived' errors, noting that waiver occurs when a defendant specifically removes claims from the trial court's consideration by intentionally relinquishing or abandoning a known right."). And divisions of this court have "assume[d] that [a] defendant is entitled to plain error review because his claim was merely forfeited and not validly waived." People v. Mumford, 275 P.3d 667, 672 (Colo. App. 2010), aff'd, 2012 CO 2, 270 P.3d 953.
¶ 30 More importantly, Bondsteel's trial counsel could have relied on cases such as Gross, Curtis, or Barrus, which we have declined to follow, when not renewing his objection to consolidation or moving to sever during trial. To hold that the issue is waived, despite this precedent, could be a retroactive application of a new rule, which might implicate due process. See, e.g., People v. LaRosa, 2013 CO 2, ¶ 18, 293 P.3d 567. But "a court should not decide a constitutional issue unless ... the necessity for such decision is clear and inescapable." People v. Lybarger, 700 P.2d 910, 915 (Colo. 1985).
¶ 31 For these reasons, and even if the misjoinder issue may have been waived rather than merely forfeited-an issue that we do not decide-we will review the merits of Bondsteel's misjoinder argument. Cf. Hinojos-Mendoza v. People, 169 P.3d 662, 667 (Colo. 2007) ("We therefore exercise our discretion to review these constitutional challenges, particularly in light of the fact that doing so will promote efficiency and judicial economy.").
¶ 32 An appellate court reviews a trial court's joinder of charges for trial for an abuse of discretion, using a two-prong analysis. Curtis, ¶ 14. The trial court abuses its discretion when the defendant suffered prejudice because of the joinder and the jury was unable to separate the facts and legal theories involved in each offense. Id. at ¶ 15.
1. Prejudice
a. Law
¶ 33 To obtain reversal for misjoinder, a defendant must first show actual prejudice, not just that "separate trials might afford the defendant a better chance of acquittal." People v. Guffie, 749 P.2d 976, 982 (Colo. App. 1987). Usually, a defendant cannot make this showing if evidence proving the charges would have been admissible in separate trials. Gross, 39 P.3d at 1282.
¶ 34 Before the trial court, Bondsteel argued that evidence of each case would not have been admissible in separate trials. But the court disagreed and allowed joinder. It applied CRE 404(b) and held that the evidence concerning charges in the motorcycle case and in the Signal Mountain Trail case would have been admissible in separate trials for three purposes: to prove motive, intent, and modus operandi.
*891 ¶ 35 CRE 404(b) permits evidence of "other crimes, wrongs, or acts" to be admitted to show motive; intent; a common plan, scheme, or design; or identity. Admissibility of CRE 404(b) evidence is subject to a four-part inquiry. See People v. Spoto, 795 P.2d 1314, 1318 (Colo. 1990). Before admitting evidence of other acts, a trial court must find that (1) the evidence relates to a material fact; (2) the evidence is logically relevant to that fact; (3) the logical relevance is independent of the prohibited inference that the defendant has a bad character; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice under CRE 403. Id.
b. Application
¶ 36 In the Signal Mountain Trail case, the victims escaped before Bondsteel sexually assaulted either of them. Still, he was charged with second degree kidnapping-"the victim was the victim of a sexual offense"-and attempted sexual assault. As to the kidnapping charge, the verdict form included a yes or no question asking whether "the person who was kidnapped was also a victim of attempted sexual assault."
¶ 37 To obtain a conviction on these charges, the prosecution had to prove Bondsteel's "willfulness or intent to do the act" for the second degree kidnapping charges, People v. Henderson, 810 P.2d 1058, 1062 (Colo. 1991) (citation omitted), and that he intended to commit particular acts which, if completed, would constitute sexual assault for the attempt charges, see People v. Buerge, 240 P.3d 363, 368 (Colo. App. 2009) (citation omitted). Motive is "probative of intent." People v. Snyder, 874 P.2d 1076, 1079 (Colo. 1994). Thus, the first Spoto factor is satisfied because the CRE 404(b) evidence was offered to prove material facts: Bondsteel's motive and intent.
¶ 38 The second Spoto factor requires that the CRE 404(b) evidence be logically relevant to these material facts. Bondsteel's plan of accosting women for sexual gratification-clearly shown by his having ordered the victims in the motorcycle case to move or remove articles of clothing-is logically relevant to both motive and intent. As well, the similarities in Bondsteel's means of carrying out each attack were logically relevant to demonstrate a common modus operandi. See People v. Jones, 2013 CO 59, ¶ 26, 311 P.3d 274 ; People v. Williams, 899 P.2d 306, 313 (Colo. App. 1995). Thus, the second Spoto factor is met because, by considering the Signal Mountain Trail case in light of the evidence in the motorcycle case, a jury could conclude that when Bondsteel accosted the victims, his motive was to obtain sexual gratification and that he intended to commit a sexual assault.
¶ 39 Under Spoto's third factor, the logical relevance of the CRE 404(b) evidence must be independent of the inference "that a person who engages in a bad act does so because he acts in conformity with his bad character." Jones, ¶ 16. Bondsteel's acts in both cases were similar in several ways: the attacks were premeditated rather than adventitious, they all occurred within Larimer County, they all occurred within six months, they all occurred outdoors, the assailant concealed his identity to some extent, the assailant used or threatened to use a weapon, the assailant moved or ordered the victims to move or remove clothing, and the assailant retreated when faced with resistance. Thus, the jury could have inferred that Bondsteel was more likely to have committed another act in a similar manner, for the same motive, and with the same intent. This inference does not depend on the prohibited propensity inference.
¶ 40 Turning to the fourth Spoto factor, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. "In our review, we afford the evidence its maximum probative value and the minimum reasonable prejudicial effect." People v. Chavez, 2012 COA 61, ¶ 38, 318 P.3d 22.
¶ 41 As to probative value, motive and intent are "difficult to prove." Colo. Anti-Discrimination Comm'n v. Cont'l Air Lines, Inc., 143 Colo. 590, 605, 355 P.2d 83, 91 (1960). But as discussed above, Bondsteel's motive and intent in the motorcycle case are probative of his motive and intent in the Signal Mountain Trail case. As well, in sex *892 crime prosecutions, the General Assembly favors admitting evidence of prior sexual assaults because this evidence is "typically relevant and highly probative, and it is expected that normally the probative value of such evidence will outweigh any danger of unfair prejudice." § 16-10-301(1), C.R.S. 2015.
¶ 42 To be unfairly prejudicial, evidence must "suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror." Masters v. People, 58 P.3d 979, 1001 (Colo. 2002) (quoting People v. Dist. Court, 785 P.2d 141, 147 (Colo. 1990) ). Because none of the victims in the motorcycle case were injured, and Bondsteel used weapons in both the Signal Mountain Trail case and the motorcycle case, the evidence from the motorcycle case does not rise to this level.
¶ 43 Despite all this, Bondsteel broadly asserts that the incidents in the motorcycle case were not distinctive and the Signal Mountain Trail case was so dissimilar from the motorcycle case that joinder cannot be upheld under CRE 404(b). To be sure, similarity often informs the CRE 404(b) inquiry. See, e.g., Jones, 2013 CO 59, 311 P.3d 274. Thus, although Bondsteel does not focus on any particular Spoto factor, we address his assertions as an addendum to our Spoto analysis.
¶ 44 In People v. Rath, 44 P.3d 1033, 1041-42 (Colo. 2002), our supreme court explained that the requisite degree of similarity between the prior acts will vary depending on the purpose for which the prosecution offers them. When the evidence is offered to show motive, the "similarity of the crimes often has no significance whatsoever." Id. at 1042. The court offered as an example admitting evidence of a defendant's drug use in his robbery trial; the acts are dissimilar, but one shows the motive for the other. Id. ; see United States v. Brooks, 125 F.3d 484, 500 (7th Cir. 1997). Conversely, evidence of identity "generally depends much more heavily on the distinctiveness and similarity of the crimes." Rath, 44 P.3d at 1042. Between these extremes, when prior acts evidence is offered to show a common modus operandi or intent, some similarity is required, but the degree of similarity need not be high. See id. (citation omitted).
¶ 45 Jones is the supreme court's most recent application where the prior acts evidence, while similar, was not identical to the evidence of the charged offense. The prosecutor offered prior acts evidence to show a common plan or scheme, among other purposes. Id. at ¶ 24. In each prior incident, the defendant had nonconsensual sex with a blond, white female victim; the victim had been drinking before the attack; the attack occurred at night; and the victim suffered facial injuries. Id. at ¶¶ 2-3, 24. The supreme court upheld admission of this evidence under CRE 404(b). Id. at ¶ 29.
¶ 46 Here, despite the parallels between the Signal Mountain Trail case and the motorcycle case, Bondsteel asserts that the method evidence in the motorcycle case was not distinctive. He also points to three dissimilarities from the Signal Mountain Trail case: the victims were targeted differently; the interactions in the motorcycle case did not occur in isolated areas; and in the motorcycle case, the helmet may not have entirely obscured the perpetrator's face. For two reasons, these assertions are insufficient to show an abuse of discretion.
¶ 47 First, Bondsteel misapplies distinctiveness. True enough, while similarity and distinctiveness are not synonymous, both may bear on the probative value of CRE 404(b) evidence. See Perez v. People, 2015 CO 45, ¶ 27, 351 P.3d 397. But distinctiveness usually denotes unique facts beyond those that are common to all crimes of a particular type. Cf. People v. Salazar, 2012 CO 20, ¶ 26, 272 P.3d 1067 (In both the prior act and the charged offense, the perpetrator digitally penetrated and engaged in intercourse with a child victim, which the court determined to be conduct "common to sexual assaults, rather than the signature of a single perpetrator."). Bondsteel does not make this argument.
¶ 48 Second, turning to the three differences that Bondsteel raises, the record diminishes two of them. Although all of the incidents in the motorcycle case occurred on or adjacent to public roadways, one occurred *893 at night on a neighborhood street, and another occurred on a road pull-off. One of these victims testified that all she could see "was a solid helmet and then a block of tinted glass where the eyes would be able to look out," meaning that the perpetrator's face was covered, as it was in the Signal Mountain Trail case.
¶ 49 Thus, while Bondsteel targeted the victims in the Signal Mountain Trail case and the motorcycle case differently, the similarities still sufficiently outweigh the differences to uphold the trial court's discretionary ruling. See People v. Lahr, 2013 COA 57, ¶ 18, 316 P.3d 74 ("[A] court may consider numerous less unique factors in determining the degree of similarity between the 'other act' and the crime charged."). And even if the question were close-which it is not-recurrence of a particular scenario, as with Bondsteel's ordering the victims to move or remove clothing in the motorcycle case, as well as moving N.D.'s clothing in the Signal Mountain Trail case, would tip the scale in favor of admissibility. See People v. Casias, 2012 COA 117, ¶ 39, 312 P.3d 208 ("The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault.") (citation omitted).
¶ 50 In the end, we discern no abuse of discretion in admitting evidence under CRE 404(b) to show a common method or modus operandi. And such a common method informs the inquiry into intent, strengthening the probative value of the prior acts evidence. See, e.g., People v. Morales, 2012 COA 2, ¶¶ 32-33, 298 P.3d 1000. Thus, because evidence of the motorcycle case and the Signal Mountain Trail case would have been admissible in separate trials under CRE 404(b), Bondsteel has not shown that he suffered actual prejudice when the trial court consolidated the cases.
2. Ability to Separate[5]
a. Law
¶ 51 Some divisions of this court have held-without further analysis-that the separation prong of a misjoinder analysis is not satisfied when the jury acquits the defendant of one or more charges or convicts on a lesser charge. See People v. Garcia, 2012 COA 79, ¶ 30, 296 P.3d 285 ; Pasillas-Sanchez, 214 P.3d at 530 ; People v. Smith, 121 P.3d 243, 246-47 (Colo. App. 2005).
¶ 52 In the absence of an acquittal or conviction on a lesser charge, other divisions of this court have looked at various factors to determine whether the jurors were able to separate facts and legal theories. See Curtis, ¶ 23 ; People v. Wortham, 690 P.2d 876, 877 (Colo. App. 1984). These factors include whether the jury was instructed to consider each charge separately; whether the charges were factually distinguishable; and lack of factual, evidentiary, or legal complexity. See Curtis, ¶ 23 ; Wortham, 690 P.2d at 877.
b. Application
¶ 53 The jury acquitted Bondsteel of five charges and convicted him of a lesser included offense of another charge. These verdicts show that the jury was able to separate the facts and legal theories involved in each offense. The factors noted in Curtis and Wortham lead to the same conclusion.
¶ 54 The jury was instructed that "the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count." Bondsteel does not dispute the adequacy of this instruction. The Signal Mountain Trail case and the motorcycle case involved distinct facts and some different legal theories. But the facts and legal theories were not so complex as to suggest a risk of jury confusion. See Curtis, ¶¶ 2-4, 23 (stating that presented facts and legal theories were not unduly complex where each case involved separate sexual assault victims and differing levels of force used in the assaults); Wortham, 690 P.2d at 877-78 (holding facts and legal theories were not overly complex in a criminal trespass case where defendant *894 walked into two different residences over a span of about one hour).
¶ 55 Therefore, Bondsteel has not shown that the jury was unable to separate the facts and legal theories involved in each offense.
¶ 56 In sum, because Bondsteel fails to satisfy either prong of the misjoinder test, we conclude that the trial court did not abuse its discretion in joining the cases for trial.
III. Unconstitutional Joinder As Applied
¶ 57 Bondsteel further contends Crim. P. 8, 13, and 14 are unconstitutional as applied to him. We decline to address the merits of this contention because we agree with the Attorney General that he lacks standing to raise it.
A. Standing
¶ 58 "Standing is a question of law that we review de novo." Taxpayers for Pub. Educ. v. Douglas Cty. Sch. Dist., 2015 CO 50, ¶ 13, 351 P.3d 461. It is "a threshold issue that must be satisfied in order to decide a case on the merits." First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC, 166 P.3d 166, 179 (Colo. App. 2007). And if a party lacks standing, an appellate court lacks jurisdiction. Ainscough v. Owens, 90 P.3d 851, 855 (Colo. 2004).
¶ 59 For a party to have standing to challenge a rule or statute as applied, "there must be an actual application or at least a reasonable possibility of enforcement or threat of enforcement." Developmental Pathways v. Ritter, 178 P.3d 524, 534 (Colo. 2008).
B. Severance
¶ 60 A trial court may sever charges into separate trials if trying the offenses jointly prejudices the defendant. Crim. P. 14. A defendant may establish prejudice by, among other things, making a "convincing showing" that he has both important testimony to provide concerning one case and a strong need to remain silent regarding the other case. See People v. Walker, 189 Colo. 545, 550, 542 P.2d 1283, 1286-87 (1975) (quoting Baker v. United States, 401 F.2d 958, 977 (D.C. Cir. 1968) ).
C. Application
¶ 61 Bondsteel argues that requiring him to make a "convincing showing" to the court-in effect, previewing his case to the prosecution's benefit-violates his constitutional rights to due process, present a defense, remain silent, and testify. He does not cite any directly supporting authority. The Attorney General responds that Bondsteel lacks standing to bring this challenge because he never sought a severance. Bondsteel's reply brief does not explain how he would have standing under these circumstances.[6]
¶ 62 Because Bondsteel failed to move to sever the charges, he was never in the position of having to disclose his anticipated testimony. Thus, he never suffered the constitutional disability that he now asserts. And when "there has yet to be any enforcement of [a statute's] provisions, an as-applied challenge to the statute is not ripe for review." Developmental Pathways, 178 P.3d at 534.
¶ 63 True enough, after the prosecution rested and in response to the trial court's Curtis advisement, Bondsteel made a single reference to wishing that he could testify in only one of the cases, but since he could not do so, he would exercise his right not to testify at all. Even so, as discussed above, he did not then renew his objection to joinder or request a severance.
¶ 64 Nor can we confer standing based on the "reasonable possibility of enforcement" prong of the Developmental Pathways test. Had Bondsteel desired a severance before trial, seeking to testify in just one of the cases would not have been the only possible ground on which to do so.See, e.g., People v. Early, 692 P.2d 1116, 1119 (Colo. App. 1984) (In determining whether defendant suffered actual prejudice by the court's denial of his motion to sever, "[t]he important inquiry is *895 whether the trier of fact will be able to separate the facts and legal theories applicable to each offense." (quoting People v. Pickett, 194 Colo. 178, 183, 571 P.2d 1078, 1082 (1977) )). Thus, without more, the record does not establish a "reasonable possibility" of enforcement of the Walker standard, on which Bondsteel's constitutional argument rests.
IV. Suppression
¶ 65 Bondsteel next contends that because the pretrial lineups-in which N.D. and K.D. both identified him as their attacker-were unduly suggestive, their identifications should have been suppressed. We conclude that the trial court properly denied Bondsteel's motion to suppress these identifications.
A. Preservation and Standard of Review
¶ 66 Bondsteel preserved this claim by moving to suppress and making the same arguments that he now raises on appeal. The constitutionality of a pretrial identification is a mixed question of law and fact. People v. Howard, 215 P.3d 1134, 1136 (Colo. App. 2008). "Thus, while the trial court's findings of historical fact are entitled to deference, we may give different weight to those facts and may reach a different conclusion in light of the legal standard." People v. Carrasco, 85 P.3d 580, 584 (Colo. App. 2003).
B. Facts
¶ 67 Both of the Signal Mountain Trail victims separately viewed a lineup. All six lineup participants were dressed in camouflage with head coverings, leaving only their eyes visible, just as the victims had described their attacker to sheriff's office deputies. Four of the participants have blue eyes; Bondsteel and one other participant have brown eyes. The participants were of comparable weight and height. The trial court found that both N.D. and K.D. were "certain" and "definite" in identifying Bondsteel from the lineups.
C. Law
¶ 68 Analyzing the constitutionality of a pretrial identification involves two steps. First, a defendant must show that the procedure was impermissibly suggestive. Bernal v. People, 44 P.3d 184, 191 (Colo. 2002). An identification is impermissibly suggestive if, based on the totality of the circumstances, there is a substantial likelihood of misidentification. People v. Walford, 716 P.2d 137, 140 (Colo. App. 1985). If the identification is not impermissibly suggestive, the analysis ends. See Bernal, 44 P.3d at 191. But if the identification is impermissibly suggestive, then at the second step the burden shifts to the prosecution to show that the identification was nonetheless reliable under the totality of the circumstances. Id.
D. Application
¶ 69 Bondsteel asserts that the disparity in the participants' eye colors rendered the lineups impermissibly suggestive. He does not challenge the lineups on any other ground. We reject this assertion for two reasons.
¶ 70 First, one disparate characteristic does not necessarily doom a pretrial identification. In the photo array context, Colorado courts have noted that all the photos need not "be uniform with respect to one given characteristic." Id. at 192 ; People v. Plancarte, 232 P.3d 186, 191 (Colo. App. 2009) (stating that disparity in facial hair is one factor to consider, but this disparity does not necessarily render an array impermissibly suggestive). At least one court has rejected a claim that a photo array was impermissibly suggestive when only one other participant had the same eye color as the defendant.See Commonwealth v. Crork, 966 A.2d 585, 589 (Pa.Super.2009). And another court has indicated a photo array is not unduly suggestive even if the defendant is the only participant with a different eye color. See Oakes v. Commonwealth, 320 S.W.3d 50, 57 (Ky. 2010) (citing Crork, 966 A.2d at 589-90 ).
¶ 71 Second, we have independently reviewed a video recording of the lineups. See People v. Thames, 2015 CO 18, ¶ 24, 344 P.3d 891 (court noted its "independent review of the video interrogation"). Our review does not support Bondsteel's assertion that K.D. and N.D. focused on the participants' eyes.
*896 ¶ 72 Each participant read a script of the statements that K.D. and N.D. told the investigating officers the assailant had said to them. N.D. focused on the participants' voices, asking two of them-including Bondsteel-to repeat or state other phrases. And nothing in the video indicates that K.D. was focusing primarily on the participants' eyes. Thus, we do not agree that the lineups were impermissibly suggestive.
¶ 73 The trial court identified several factors supporting its dual conclusions that "the identifications were reliable and they were not the product of any undue suggestiveness." The court relied on a pre- Bernal case that did not employ the two-step analysis. See People v. Mascarenas, 666 P.2d 101, 109 (Colo. 1983) ("The test for determining whether a particular showup violates a defendant's due process rights is whether, under the totality of the circumstances, the identification was unreliable because the confrontation was unnecessarily and irreparably suggestive."). Even so, the trial court's underlying findings are informative and have record support. See People v. Barrow, 139 P.3d 636, 638 (Colo. 2006) (An appellate court "will not disturb the trial court's findings of fact when ruling on a suppression motion if those findings have competent factual support in the record.").
¶ 74 These factors, extrinsic to the lineups and probative of the reliability of the identifications, included the "relatively short[ ]" length of time between the incident and the lineups, the victims' "excellent opportunity to observe" their attacker, the close attention the victims paid to their attacker, the general accuracy of the victims' description of their attacker, the victims' intelligence and articulate nature, and the victims' confidence in their identifications. The trial court's analysis reflects the considerations identified in Bernal to evaluate the reliability of a suggestive identification:
(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.
44 P.3d at 192 ; see also Commonwealth v. Thomas, 278 Pa.Super. 39, 419 A.2d 1344, 1348 (1980) (noting victim's articulate and intelligent nature was one factor in determining identification was reliable).
¶ 75 Of course, the trial court did not need to consider the reliability of the identifications unless it determined that the lineups were impermissibly suggestive. Bernal, 44 P.3d at 191. But we decline to conclude that the court impliedly found the lineups impermissibly suggestive because it took up the reliability of the identifications. And in any event, our independent examination of the lineups dispels Bondsteel's assertion the lineups were impermissibly suggestive.
¶ 76 For these reasons, we reject Bondsteel's contention that the trial court erred in denying his motion to suppress.
V. Juror Challenge for Cause
¶ 77 Bondsteel next contends the trial court wrongfully denied his for-cause challenge to juror J.H., whom he eventually excused with a peremptory challenge. Bondsteel preserved this issue by exhausting all of his peremptory challenges. The trial court's denial of a for-cause juror challenge is reviewed for an abuse of discretion. People v. Pifer, 2014 COA 93, ¶ 19, 350 P.3d 936.
¶ 78 Even if a trial court has abused its discretion, an appellate court will reverse only if the error was not harmless "under the proper outcome-determinative test." People v. Novotny, 2014 CO 18, ¶ 27, 320 P.3d 1194. This test requires a defendant to establish "a reasonable probability that the error contributed to the verdict." People v. Maestas, 2014 COA 139M, ¶ 12, 343 P.3d 1038. And the defendant can do so only by showing that because of the wrongful denial of the challenge for cause, "a different biased or incompetent juror sat on the jury." Id.
¶ 79 But Bondsteel does not allege that a biased or incompetent juror sat on the jury instead of J.H. Rather, he asserts that applying Novotny retroactively to him would violate due process. This assertion is unpersuasive for the reasons set forth in *897 People v. Wise, 2014 COA 83, ¶¶ 10-14, 348 P.3d 482 (noting the widespread criticism of the automatic reversal rule in place pre- Novotny and explaining that "we are not persuaded that the supreme court's abrogation of the rule was both unexpected and indefensible under the law which had been expressed prior to defendant's trial or appeal").
¶ 80 Therefore, even if the trial court abused its discretion in denying the challenge for cause, Bondsteel is not entitled to relief because he has failed to show prejudice.
VI. Lack of Limiting Instruction
¶ 81 Bondsteel next contends the trial court committed reversible plain error by failing to instruct the jury sua sponte on the limited purposes for which it could consider evidence of the motorcycle case in relation to the Signal Mountain Trail case. We reject this contention.
A. Preservation and Standard of Review
¶ 82 Because Bondsteel did not ask the trial court to give a limiting instruction, this claim is reviewed for plain error. People v. Griffin, 224 P.3d 292, 298 (Colo. App. 2009).
¶ 83 Plain error permits an appellate court "to correct particularly egregious errors." Wilson v. People, 743 P.2d 415, 420 (Colo. 1987). The error must be " 'so clear-cut, so obvious,' a trial judge should be able to avoid it without benefit of objection." People v. Ujaama, 2012 COA 36, ¶ 42, 302 P.3d 296 (quoting People v. Taylor, 159 P.3d 730, 738 (Colo. App. 2006) ).
¶ 84 An appellate court will reverse only if a defendant shows "that the court committed an obvious and substantial error that undermined the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction." Griffin, 224 P.3d at 298. And reversals under plain error "must be rare to maintain adequate motivation among trial participants to seek a fair and accurate trial the first time." Hagos v. People, 2012 CO 63, ¶ 23, 288 P.3d 116.
B. Law
¶ 85 Recall that CRE 404(b) permits a party to introduce evidence of uncharged crimes or prior acts for certain purposes, other than showing that the defendant acted in conformity with a particular character trait. If such evidence is admitted, "[g]enerally, a trial court should instruct the jury on the limited purposes for which CRE 404(b) evidence may be considered." People v. Warren, 55 P.3d 809, 815 (Colo. App. 2002). Still, CRE 404(b) does not require the trial court to do so. And "[a]bsent a statutory requirement, a trial court is under no obligation to issue a limiting instruction sua sponte." People v. Clark, 2015 COA 44, ¶ 134.
¶ 86 Instead, defense counsel is "charged with the task of deciding whether a limiting instruction is desirable." Griffin, 224 P.3d at 298. This must be so because counsel may have concluded that a limiting instruction would be more harmful than helpful. See, e.g., People v. Gladney, 194 Colo. 68, 72, 570 P.2d 231, 234 (1977).
¶ 87 For these reasons, divisions of this court have held that a trial court's failure to give a limiting instruction sua sponte in the CRE 404(b) context is not reversible plain error. See, e.g., People v. Beilke, 232 P.3d 146, 152 (Colo. App. 2009) ; People v. Rivera , 56 P.3d 1155, 1168 (Colo. App. 2002). Bondsteel fails to cite either contrary Colorado cases or a statute requiring a limiting instruction.
C. Application
¶ 88 Bondsteel's argument mirrors the argument the division rejected in Owens, 97 P.3d at 232, a decision we consider well-reasoned. In Owens, the trial court consolidated three cases against the defendant for trial because evidence of each crime would have been admissible in separate trials. Id. at 231-32. The defendant did not request a limiting instruction, and the court did not give one sua sponte. Id. at 232. The division held that reversal was not required "because the trial court failed to sua sponte limit the purposes for which the jury could consider evidence of each incident in relation to the *898 other two." Id. (citing Cordova v. People, 880 P.2d 1216, 1220 (Colo. 1994) ).
¶ 89 Thus, we conclude the trial court did not commit reversible plain error.
VII. Second Degree Kidnapping
A. Sufficiency of the Evidence
¶ 90 Bondsteel next contends the evidence was insufficient to convict him for second degree kidnapping of N.D. and K.D.; alternatively, he contends the jury instructions on these counts were deficient. As to K.D., we agree with Bondsteel's first contention, which moots his second contention. As to N.D., we reject both of his contentions.
1. Additional Background
¶ 91 According to the prosecution's evidence, while sisters-in-law N.D. and K.D. were hiking on the Signal Mountain Trail, Bondsteel abruptly appeared from the woods, grabbed N.D.'s backpack strap, held a knife to her throat, and forced her to the ground on the trail. As he pinned N.D. down, Bondsteel ordered K.D. to sit next to a small evergreen tree between him and K.D. Crime scene photos show that the tree is next to the trail and at most chest high. K.D. testified that after she saw Bondsteel "start to pull on [N.D.'s] clothes," she felt that "he's going to rape [N.D.]."
¶ 92 To "slow the situation down," K.D. told Bondsteel that their husbands would be coming down the trail at any moment. Bondsteel ordered K.D. to walk away from the trail and toward the woods. She testified that she refused this order. Then he grabbed N.D. around her neck, pulled her to her feet, kept the knife to her throat, and dragged her in the same direction that he had ordered K.D. to walk. N.D. testified that Bondsteel "drag[ged] me off the side of the hill across the trail, down to a more flat area by the creek." But according to K.D., Bondsteel only dragged N.D. "a couple of steps" before K.D. hit him on the head with her walking stick. Bondsteel fled, and the women escaped.
2. Preservation and Standard of Review
¶ 93 Bondsteel preserved this claim by moving for a judgment of acquittal based on insufficient evidence of asportation. An appellate court reviews a sufficiency claim de novo, considering the evidence in the light most favorable to the prosecution. Dempsey v. People, 117 P.3d 800, 807 (Colo. 2005).
3. Law
¶ 94 The asportation element of kidnapping involves "the seizing and carrying of a person from one place to another." Owens, 97 P.3d at 235 (citing People v. Harlan, 8 P.3d 448, 476 (Colo. 2000), overruled on other grounds by People v. Miller, 113 P.3d 743 (Colo. 2005) ); see also § 18-3-302(1), C.R.S. 2015 ("knowingly seiz[ing] and carr[ying] any person from one place to another, without his consent and without lawful justification"). This element is "satisfied when 'the defendant moved [a] victim.' " Owens, 97 P.3d at 235 (quoting Harlan, 8 P.3d at 476-77 ).
¶ 95 In People v. Rogers, 220 P.3d 931, 936 (Colo. App. 2008), a division of this court found no plain error in defining "seizing and carrying" as "any movement, however short in distance." Our precedent has not precisely defined "from one place to another," probably because the concept is already implicit in "carrying." But Colorado courts have held that a substantial increase in the risk of harm to the victim "suffices to support the conviction" when the actual movement is either "insubstantial" or doubtful. Owens, 97 P.3d at 235 ; see also Apodaca v. People, 712 P.2d 467, 475 (Colo. 1985) ; People v. Ridenour, 878 P.2d 23, 25 (Colo. App. 1994).
¶ 96 The supreme court reconciled these principles in Harlan, 8 P.3d at 476, by explaining that
the defendant's conduct substantially increas[ing] a risk of harm to the victim is not a material element of second degree kidnapping. It is instead a factual circumstance reviewing courts consider in some cases to determine whether there is sufficient evidence to prove that the defendant *899 moved the victim from one place to another.
(Emphasis added.)
¶ 97 Since Harlan, divisions of this court have affirmed second degree kidnapping convictions involving minimal movement based on an increased risk of harm to the victim. In Owens, 97 P.3d at 236, the division affirmed second degree kidnapping convictions where the defendant forced two victims at knifepoint from a restaurant entrance to a windowless office. The division explained that this movement, although a short distance, substantially increased the victims' risk of harm because the public could no longer see them. Id. Likewise, in Rogers, 220 P.3d at 936, the defendant moved the victim a short distance from his dining room to a bedroom. Still, the division concluded that because the bedroom offered more limited opportunities for escape, the victim faced a substantially increased risk of harm. Id.
¶ 98 By contrast, another division of this court concluded that forcing a victim from the living room to a bedroom, leaving him alone in the bedroom, and confining him for only a short period of time did not substantially increase the risk of harm to the victim. People v. Bell, 809 P.2d 1026, 1033 (Colo. App. 1990). Thus, these cases are fact specific.[7]
4. Application
a. Movement from One Place to Another
¶ 99 The record shows that K.D. moved only a few feet in any direction during the attack. But by crediting N.D. where her testimony conflicted with that of K.D., a reasonable jury could have concluded that N.D. moved a greater distance.
¶ 100 Bondsteel ordered K.D. to sit next to a small tree adjacent to the trail, where she remained until she struck him. After forcing N.D. to the ground on the trail, he dragged her only "a couple of steps" off of the trail, according to K.D., before K.D. hit him. But N.D. testified that Bondsteel dragged her across the trail and "down to a more flat area by the creek." At least one crime scene photo shows a small creek about twenty feet off of the trail. And N.D.'s testimony did not make clear exactly where she was when K.D. hit Bondsteel.
¶ 101 True enough, K.D.'s specific testimony-that Bondsteel dragged N.D. "maybe a couple of steps" and that "one step in either direction gets you off the trail"-indicates that Bondsteel's movement of N.D. was minimal. And this testimony is consistent with the next event: even after Bondsteel had dragged N.D. across the trail, he remained within striking distance of K.D., who had refused to move away from the trail. Still, taking the evidence in the light most favorable to the prosecution, we cannot disturb the verdict on the basis that, as a matter of law, the jury should have accepted K.D.'s version over that of N.D. And N.D.'s version described movement from "one place to another."
¶ 102 As to K.D., however, her indisputably insubstantial movement does not, on its own, show that Bondsteel moved her from "one place to another." Harlan, 8 P.3d at 476 ; see also Bell, 809 P.2d at 1033 (moving victim within his own house was insubstantial).
b. Increased Risk
¶ 103 But recall that the asportation element may also be satisfied "by proof that the defendant's movement of the victim substantially increased the risk of harm to the victim." Owens, 97 P.3d at 237. Even assuming that N.D.'s movement may have been insubstantial-because the distance between *900 the trail and the creek is only an estimate-we conclude that the movement still sufficiently increased her risk of harm. Once she was no longer on or immediately adjacent to the trail, she would be less visible to other hikers and escape would be more difficult.
¶ 104 In contrast, a close look shows that the record lacks such proof with regard to K.D.
¶ 105 To begin, the record does not show that forcing K.D. to sit next to the small evergreen tree substantially increased her risk of harm. Neither K.D. nor N.D. testified that the tree would have made someone seeing either of them from the trail more difficult, as the Attorney General implies.
¶ 106 Nor does anything in the record support the Attorney General's suggestion that by positioning K.D. next to this tree, she was somehow less able to escape. See People v. Huggins, 825 P.2d 1024, 1026 (Colo. App. 1991) (moving victim to place of seclusion with minimal chance of escape substantially increased risk of harm). To the contrary, from this new position K.D. arose and hit Bondsteel with her walking stick, which allowed the victims to escape.
¶ 107 And K.D.'s position near the tree did not hamper her ability to watch Bondsteel and N.D. She testified:
Q: Okay. So now you're sitting there, you're kind of squatted. Can you see [N.D.]?
A: Yes. I can see her, because she is on the other side of that little tree, but I can see through the tree pretty easily, so I can see her. I can't necessarily see every single detail, but I can see her and I can see him and what he's doing.
¶ 108 Because we conclude that the evidence on the second degree kidnapping conviction of K.D. was insufficient, we reverse this conviction and vacate the accompanying sentence.
B. Jury Instructions
¶ 109 Bondsteel contends the trial court erred by refusing to instruct the jury that to satisfy the asportation element of second degree kidnapping, the movement must be substantial; if not substantial, then the movement must substantially increase the risk of harm to the victim. Taking up this issue only as to N.D., we conclude the trial court properly instructed the jury.
1. Additional Background
¶ 110 At trial, Bondsteel's counsel requested an interrogatory regarding the "seizing and carrying" component of second degree kidnapping. The proposed interrogatory asked first whether the movement of the victims was substantial and, if not, whether the movement substantially increased the risk of harm to the victims. The court rejected the proposed interrogatory.
¶ 111 Later, Bondsteel's counsel requested that "seized and carried" be defined in the instructions to "include the substantial increase of harm to the victim." The court also denied this request.
¶ 112 The final second degree kidnapping instruction for N.D. read:
1. That the defendant,
2. in the State of Colorado, at or about the date and place charged,
3. knowingly,
a. seized and carried [N.D.] from one place to another,
b. without her consent, and
c. without lawful justification[.]
¶ 113 While deliberating, the jury asked the court to define "seized and carried." Bondsteel's counsel argued the court should either decline to define the phrase or include the language regarding substantial movement and a significantly increased risk of harm. The court again rejected counsel's interpretation. It defined "seizing and carrying" as "any movement of a victim, however short in distance, brought about without the consent of the victim."
2. Preservation and Standard of Review
¶ 114 The parties agree that Bondsteel preserved this contention. An appellate court reviews "legal conclusions implicit in jury instructions de novo[.]" Townsend v. People, 252 P.3d 1108, 1111 (Colo. 2011).
*901 3. Application
¶ 115 As our supreme court explained in Harlan, 8 P.3d at 476, and as divisions of this court have reiterated, "[t]hat the defendant's conduct substantially increased a risk of harm to the victim is not a material element of second degree kidnapping." See also Rogers, 220 P.3d at 936 ; Owens, 97 P.3d at 236. Thus, a trial court need not instruct the jury that the prosecution must prove the movement substantially increased the victim's risk of harm. See Harlan, 8 P.3d at 476.
¶ 116 As well, in response to the jury's question, the trial court properly declined to define "seized and carried" as requiring proof of an increased risk of harm. The division in Rogers, 220 P.3d at 936, concluded that defining "seizing and carrying" as "any movement, however short in distance" was not plain error. The trial court's definition of "seized and carried" in Bondsteel's case tracked the Rogers language.
¶ 117 To the extent that the substantial increase in risk of harm to the victim may apply to the other component of asportation-"from one place to another"-a division of this court has explained, consistent with Harlan, that this component does not require any further jury instruction. Owens, 97 P.3d at 237. We consider the division's analysis well-reasoned and decline Bondsteel's invitation to depart from it.
¶ 118 We conclude that the jury was properly instructed regarding second degree kidnapping.
VIII. Prosecutorial Misconduct
¶ 119 Bondsteel finally contends we must reverse because the prosecutors misrepresented the nature of DNA evidence during closing argument. He points out that three times during the initial closing and once during rebuttal closing, which were given by different prosecutors, they asserted that his DNA "matched" a DNA sample collected from N.D.'s backpack, and that the prosecutors described the DNA sample on the backpack as containing "his DNA" or similar language. Defense counsel did not object to any of these statements. But during the defense closing, counsel explained the limitations in matching DNA samples based on the Y-STR[8] analysis used.
A. Preservation and Standard of Review
¶ 120 Because defense counsel did not object to the prosecutors' statements that Bondsteel now challenges on appeal, the claim is unpreserved. Even so, Bondsteel asserts that we should review all of these statements for plain error under Crim. P. 52(b). See, e.g., People v. Rhea, 2014 COA 60, ¶ 69, 349 P.3d 280.
¶ 121 The Attorney General responds that because Bondsteel invited any error with regard to the match statements by declining to object for strategic reasons, as opposed to inadvertence, the error is not reviewable. However, the Attorney General concedes the application of plain error review to the other category of contested statements.
¶ 122 As for the match statements, we agree with the Attorney General in part. The record creates a strong inference that defense counsel made a tactical choice not to object. But Colorado law does not treat mere silence as invited error. Still, because plain error review assumes counsel's inadvertence, we decline to review the match statements for plain error. We review the remaining statements for plain error, noting again that reversal is a "drastic remedy." Domingo-Gomez v. People, 125 P.3d 1043, 1055 (Colo. 2005).
B. Law
¶ 123 Evaluating a prosecutorial misconduct claim involves a two-step inquiry. First, an appellate court determines whether the conduct at issue was improper based on the totality of the circumstances. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). Second, the court determines whether the conduct at issue warrants reversal under the appropriate standard of review. Id.
¶ 124 A "prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn *902 from those facts." People v. Strock, 252 P.3d 1148, 1153 (Colo. App. 2010). As a result, prosecutorial misconduct amounting to plain error "must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." Id. at 1152 (citation omitted). A reviewing court examines allegedly improper arguments "in the context of the prosecutor's closing argument as a whole." People v. Villa, 240 P.3d 343, 356 (Colo. App. 2009).
C. Application
1. Match Statements
¶ 125 Everyone would agree that the linchpin for plain error review is an inadvertent error or omission by defense counsel. See, e.g., People v. Stewart, 55 P.3d 107, 119 (Colo. 2002) ; see also People v. Gross, 2012 CO 60, ¶ 9, 287 P.3d 105 (citing Stewart, 55 P.3d at 119 ). And so, inadvertence is required before a court takes up the three-factor test for plain error. See Stewart, 55 P.3d at 119-20.
¶ 126 By contrast, under the invited error doctrine, appellate courts will not consider claims if the appealing party's affirmative action injected the error into the case. See People v. Zapata, 779 P.2d 1307, 1309 (Colo. 1989). As the division explained in People v. Foster, 2013 COA 85, ¶ 36, 364 P.3d 1149 : "[W]e read Gross to distinguish errors based on trial counsel's omission from those of commission in limiting appellate review. While appellate courts may review the former for plain error, the latter generally will be unreviewable." But the Attorney General cites no Colorado authority, nor have we found any, applying the invited error doctrine when counsel merely remains silent, even if for tactical reasons.[9] So, how can these principles limiting appellate review be reconciled?
¶ 127 Several states have done so by denying plain error review outright. "We have repeatedly held that strategic trial decisions by defense counsel will not be reviewed in a direct appeal for plain error." Robinson v. State, 3 A.3d 257, 261 (Del. 2010) ; accord State v. Burke, 182 Conn. 330, 438 A.2d 93, 94 n. 3 (1980) ("Had there been any indication that defense counsel had made a strategic decision to sit silently ... and then raise this claim of error if the verdict proved unpalatable ... we would have refused to review the defendant's claim [under the plain error doctrine].") (citation omitted); State v. Placke, 290 S.W.3d 145, 154 (Mo. Ct. App. 2009) ("Defendant cannot seek plain error review arising from failed tactical and strategic decisions made at trial."); State v. Feldmiller, 316 P.3d 991, 992 (Utah Ct. App. 2013) ("[P]lain error review is inappropriate when it resulted from the appellant's strategic decision.").
¶ 128 Other states simply deny plain error relief. State v. Rodrigues, 147 P.3d 825, 835 (Haw. 2006) ("[A] finding of plain error is generally unwarranted where the failure to object at trial is a function of trial counsel's strategic decisions."); State v. Loftin, 146 N.J. 295, 680 A.2d 677, 697 (1996) ("Because defense counsel made a strategic decision ... his decision does not provide grounds for a finding of plain error."); State v. Kiser, 284 S.W.3d 227, 281 (Tenn. 2009) ("Thus, the appellant made a tactical decision not to challenge [E.C.], and he is not entitled to plain error relief."); State v. Leroux, 184 Vt. 396, 965 A.2d 495, 500 (2008) ("We will not find plain error based on a deliberate tactical decision by counsel.").[10]
*903 ¶ 129 Because the outright denial cases are more consistent with the Stewart requirement of inadvertence to review for plain error, we follow them here.[11] Cf. People v. Shepherd, 43 P.3d 693, 696 (Colo. App. 2001) ("Because, at the very least, defendant here made a tactical decision to bypass use of a choice of evils defense, we cannot find error, much less plain error, in the trial court's failure to instruct upon that defense."). Otherwise, defense counsel could remain silent as a matter of strategy, "gamble on a favorable verdict and, upon the coming in of an adverse one, seek a second bite of the apple on the basis of plain error." Hudgins v. Serrano, 186 N.J.Super. 465, 453 A.2d 218, 221 (App.Div.1982) (citation omitted); see also People v. Fichtner, 869 P.2d 539, 543 (Colo. 1994) (requiring a contemporaneous objection discourages litigants from "gambling for favorable verdicts and then resorting to appeal on errors that might have easily been corrected by objection at trial") (citation omitted).
¶ 130 We decline to review the match statements for plain error because, for the following reasons, the record creates a strong inference that defense counsel did not object to these statements as a matter of strategy rather than due to inadvertence.
¶ 131 First, counsel conducted a thorough cross-examination and recross-examination of the prosecution's DNA expert. The questioning developed shortcomings in the Y-STR DNA analysis, including:
• the Y-STR analysis indicated at least two other contributors to the DNA sample on N.D.'s backpack;
• a Y-STR "match" is not an "exclusive match"; and
• the Y-STR "match" could also match at least 2500 other persons in Colorado.
¶ 132 Second, defense counsel began her closing by asking, "So how did we get here today to this point where everything the prosecution's presented for the past two weeks is focused on this man over here, James Bondsteel?" The answer, according to counsel, was "a misidentification in this situation, compounded by some belief that DNA is powerful beyond belief[.]" Later, counsel rebutted the prosecutor's assertions of a match by pointing out:
But when you start asking those questions, what exactly is a match? Well, a match is not a match. It means that 2,500 Caucasian males in our state alone would have that exact same match or profile on Y-STR.
....
*904 And then if you go just to the Y-STR, just the male profile that the prosecution wants you to focus on in this particular case, what happens there? If you look at that, they want you to look at just blue dots and say that this is a match with James Bondsteel. And you know that there are at least three separate males on the face of the backpack.
¶ 133 This calculated approach to the DNA evidence weighs heavily against inferring inadvertence. See Powder Horn Constructors, Inc. v. City of Florence, 754 P.2d 356, 374 n. 6 (Colo. 1988) (Vollack, J., dissenting) (defining inadvertent as "heedless, negligent, inattentive ... unintentional," Webster's Third New International Dictionary 1140 (1986), and "[h]eedlessness; lack of attention; want of care; carelessness; failure of a person to pay careful and prudent attention to the progress of a negotiation or a proceeding in court by which his rights may be affected," Black's Law Dictionary 683 (5th ed. 1979)) (alterations in original).
¶ 134 True, defense counsel did not make any objections during the prosecutor's initial or rebuttal closings. But divisions of this court have recognized that failing to object can be strategic. See, e.g., Washington, ¶ 43 (citing People v. Dillard, 680 P.2d 243, 246 (Colo. App. 1984) ); see also Houser v. Eckhardt, 506 P.2d 751, 755 (Colo. App. 1972) (not published pursuant to C.A.R. 35(f) ) ("For reasons of trial tactics or strategy counsel may elect not to object. That is his privilege, but he cannot await the outcome of the trial and then cite the alleged errors as grounds for reversal.") (citation omitted).[12] And Bondsteel does not challenge any other aspect of the prosecutors' arguments as plain error.
¶ 135 Inferring that the failure to object to the match statements was inadvertent would require us to make two assumptions. First, between defense counsel's thorough cross-examination of the DNA expert and the prosecutor's initial closing, that counsel forgot about the flaws that she had developed in Y-STR analysis. Second, just a few minutes after the prosecutor completed her initial closing, that counsel suddenly recalled those flaws and then used them to her advantage in the defense closing. Because these assumptions are implausible and somewhat inconsistent, we decline to make either of them.[13]
¶ 136 To be sure, when defense counsel failed to object to the match statements during the prosecutor's initial closing, the trial court could not have known that counsel would soon challenge them in her own closing. But the court would have been well aware of the points discussed above that defense counsel had made during her cross-examination of the DNA expert. For this reason, we are unwilling to impose on the trial court a duty to interrupt the prosecutor's initial closing sua sponte on a basis that defense counsel could have raised by objection, but did not. Had the trial court done so, it would have precluded defense counsel from exposing possible prosecutorial exaggeration of the DNA evidence in her own closing, as one example of "a lot of mistakes in this particular case," which led the sheriff's deputies to ignore "registered sex offenders" and instead "they focused on one person. They focused on this guy, James Bondsteel."[14]
*905 2. "His DNA" Statements
¶ 137 The prosecutors' statements that the DNA on the backpack was "his" and that "this man's DNA" was on the backpack, referring to Bondsteel, have some support in the record. The People's DNA expert explained that the Y-STR DNA profile obtained from the backpack "was a complete profile." She testified that she could exclude "99.8 percent" of individuals in the Caucasian, African-American, and Hispanic populations as contributors to the Y-STR profile. And she reaffirmed on cross-examination that a statistical database excluded 99.9 percent of Caucasian men from the "major component" of the Y-STR profile. Bondsteel is Caucasian.
¶ 138 The prosecutor's statement that Bondsteel's DNA was a "99.9 percent match of the Y-STR" sufficiently reflected the DNA expert's testimony. While "99.9 percent" is not equivalent to "99.8 percent," divisions of this court have often overlooked minor discrepancies between the evidence and closing argument. See, e.g., People v. Williams, 996 P.2d 237, 245 (Colo. App. 1999) (holding that prosecutor's statement that forty dollars was found in defendant's pocket, while there was no testimony establishing the exact amount, was not "so prejudicial when considered in the context of the entire closing argument as to constitute plain error").
¶ 139 As well, the prosecutor never said that the DNA sample on the backpack could have only belonged to Bondsteel. Instead, based on the number of males the DNA expert could statistically exclude from the sample, the prosecutor said that the DNA was "his." Because "[c]losing arguments are rarely scripted with precision," People v. Tillery, 231 P.3d 36, 44 (Colo. App. 2009), aff'd sub nom. People v. Simon, 266 P.3d 1099 (Colo. 2011), "reviewing courts accord prosecutors the benefit of doubt where remarks are ambiguous or simply inartful," People v. McBride, 228 P.3d 216, 221 (Colo. App. 2009) (citations omitted). And prosecutors may make arguments based on reasonable inferences from facts. See Strock, 252 P.3d at 1153.
¶ 140 Whack v. State, 433 Md. 728, 73 A.3d 186, 188 (2013), on which Bondsteel primarily relies, is distinguishable. First, because defense counsel had objected, the court was not reviewing for plain error. Id. at 189. Second, the prosecutor conflated two separate statistics: 1-in-212 trillion odds that an African-American other than the victim could have left a particular DNA profile in a DNA mixture, and 1-in-172 odds that any randomly selected African-American's DNA could be found in the mixture at issue. Id. at 197. Bondsteel's argument is for plain error, and the prosecutors did not conflate two separate statistics; they argued legitimate inferences that the statistics permitted.
¶ 141 Because these statements, even if imprecise, have some support in the record, we discern no error that could lead to reversal under plain error review. Therefore, we reject Bondsteel's prosecutorial misconduct argument.
IX. Conclusion
¶ 142 We reverse Bondsteel's second degree kidnapping conviction with regard to K.D., vacate the corresponding sentence, and remand to correct the mittimus. In all other respects, we affirm.
JUDGE FOX and JUDGE BERGER concur.

The court cited Reed v. People, 174 Colo. 43, 482 P.2d 110 (1971), abrogated by Deeds v. People, 747 P.2d 1266 (Colo. 1987). Reed is uninformative here because the defendant never filed a motion to sever, either before or during trial.

The court's citation to People v. Peterson, 656 P.2d 1301, 1304 (Colo. 1983), illustrates the latter reason. "[I]t is at least equally likely that defense counsel made a strategic decision not to seek severance. When defense counsel's strategy backfires, the resultant error cannot be urged as grounds for reversal on appeal." Id. (citation omitted).

Crim. P. 33(a) provides:
Motions for New Trial or Other Relief Optional. The party claiming error in the trial of any case may move the trial court for a new trial or other relief. The party, however, need not raise all the issues it intends to raise on appeal in such motion to preserve them for appellate review. If such a motion is filed, the trial court may dispense with oral argument on the motion after it is filed.

However, because Dembry involved a motion to sever, which the defendant did not renew at trial, it is inconsistent with Aalbu .

Unlike Colorado cases interpreting the two-prong ineffective assistance of counsel test in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), see, e.g., People v. Chipman, 2015 COA 142, ¶ 32, no Colorado case applying the two-part misjoinder test has held that failure to establish either prejudice or separateness ends the inquiry. Thus, we take up ability to separate.

An appellant's failure to respond in the reply brief to an argument made in the answer brief may be taken as a concession. See, e.g., United Coop. v. Frontier FS Coop., 304 Wis.2d 750, 738 N.W.2d 578, 588 (App.2007) ("We take this lack of reply as a concession....").

Courts in other jurisdictions differ in handling asportation generally and increased risk of harm specifically. But:
[m]ore often, ... courts stress that the kidnapping victim was taken from a relatively "safe area" to a "remote," "secluded" or "isolated" "place of seclusion." Such asportation makes the situation more dangerous for the victim in various ways; the courts emphasize that by so moving the victim the defendant has significantly reduced the victim's opportunity to make an escape or to receive assistance from others, has made the offense easier to commit, and has lessened the risk that the offense will be detected.
3 Wayne R. LaFave, Substantive Criminal Law § 18.1(b) (2d ed. 2003) (emphasis added) (footnotes omitted).

See generally People v. Brown, 2014 COA 155M-2, ¶¶ 7-8 (discussing Y-STR DNA profiles).

In People v. Zamora, 940 P.2d 939, 945 (Colo. App. 1996), a division of this court noted that "any conceivable error was invited" when defense counsel made a tactical decision to let the jury resolve a point of confusion without providing any clarifying instructions. But the division ultimately rejected the defendant's "argument that the trial court committed plain error ." Id. (emphasis added). Thus, we do not read this case to hold that the invited error doctrine applies when counsel remains silent.

Federal precedent under the counterpart to Crim. P. 52(b) is also instructive, but only to a point.See, e.g., Crumb v. People, 230 P.3d 726, 731 n. 5 (Colo. 2010) (looking to federal law interpreting a federal rule of criminal procedure that is similar to a Colorado rule). Many federal appellate courts have declined to review for plain error when the record shows that defense counsel's silence was strategic. See, e.g., United States v. Yu-Leung, 51 F.3d 1116, 1122 (2d Cir. 1995) ("If, however, the party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review.") (citations and footnote omitted); United States v. Quinones, 511 F.3d 289, 321 (2d Cir. 2007) (citing Yu-Leung as "well established" law); accord United States v. Verdugo, 617 F.3d 565, 578 (1st Cir. 2010) (holding that while unpreserved claims are usually reviewed for plain error, counsel failed to object for tactical reasons, and "[h]aving made this choice, [defendant] cannot now challenge the court's failure to exclude [testimony]," as it is waived); United States v. Si, 343 F.3d 1116, 1128 n. 3 (9th Cir. 2003) (asserting that defendant's failure to object to the same claim on appeal waives the claim, rather than forfeiting it, "because [defendant] intentionally relinquished his right to object for tactical reasons"); United States v. Gutierrez, 130 F.3d 330, 332 (8th Cir. 1997) ("We need not ... scrutinize the court's action for plain error, because [defendant], we believe, waived his right to object to it.... It is clear that at the time that the district court vacated the judgment, [defendant] made a calculated decision not to challenge the court's authority to do so. His calculation was based on a strategic choice....").
But like invited error, no Colorado case has found waiver based on mere silence. And language in some Colorado waiver cases at least suggests that waiver requires affirmative action. See, e.g., People v. Bryant, 2013 COA 28, ¶ 13 n. 2, 316 P.3d 18 ("[W]aiver occurs when a defendant specifically removes claims from the trial court's consideration.") (citing People v. Rodriguez, 209 P.3d 1151, 1160 (Colo. App. 2008) ); People v. Foster, 2013 COA 85, ¶ 37, 364 P.3d 1149 (same); but see People v. Lopez, 129 P.3d 1061, 1065 (Colo. App. 2005) ("Defendant did not, however, renew his objection. And, by acceding without objection to the prosecution's attempt to cure the problem, he waived his right to assert error on appeal."). To avoid a conflict with such cases, we do not rely on the federal waiver rule.

We do not read the list of "five types of review" in Hagos v. People, 2012 CO 63, ¶ 9, 288 P.3d 116, which ends with plain error, as a mandate that an alleged error must be reviewed for plain error unless it fits within one of the other categories. Such a reading would disregard the inadvertence requirement of Stewart .

Federal appellate cases identify reasons for a strategic decision not to object to a prosecutor's closing argument. See, e.g., Bennett v. Angelone, 92 F.3d 1336, 1349 (4th Cir. 1996) ("[R]efraining from objecting to avoid irritating the jury is a standard trial tactic."); United States v. Daniels, 558 F.2d 122, 127 (2d Cir. 1977) ("[T]he decision whether to object to an arguably improper remark [in the Government's summation] or to wait and attack it in the defense summation [is] strictly a matter of tactics.").

Ultimately, the question of inadvertence or strategy can only be answered by defense counsel. Our ruling does not preclude Bondsteel from raising an ineffective assistance of counsel claim under Crim. P. 35(c) and requesting an evidentiary hearing at which to examine counsel. See People v. Foster, 2013 COA 85, ¶ 28, 364 P.3d 1149 (citing People v. Gross, 2012 CO 60, ¶ 11, 287 P.3d 105 ). We express no opinion on the outcome of such a proceeding.

Tending to confirm our analysis are statements of federal appellate courts, which "have been extremely reluctant 'to increase the heavy burdens already imposed on trial judges in criminal cases' by mandating that the district courts act sua sponte to override seemingly plausible strategic choices on the part of counselled defendants." United States v. De La Cruz, 902 F.2d 121, 124 (1st Cir. 1990) (quoting United States v. Reveron Martinez, 836 F.2d 684, 687 (1st Cir. 1988) ).