The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 9, 2022

## 2022COA62

**No. 19CA1332, *People v. Washington* — Criminal Procedure —
Permissive Joinder — Misjoinder; Appeals — Standard of
Review — Harmless Error**

A division of the court of appeals holds as a matter of first

impression that *People v. Novotny*, 2014 CO 18, overruled *Norman

v. People*, 178 Colo. 190, 496 P.2d 1029 (1972), to the extent

*Norman* held that joinder error was automatically reversible.

Instead, the division holds that misjoinder under Crim. P. 8(a)(2) is

subject to harmless error review.

COLORADO COURT OF APPEALS                                    **2022COA62**

Court of Appeals No. 19CA1332
Arapahoe County District Court No. 17CR2285
Honorable Patricia D. Herron, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Joseph Wayne Washington,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE BERGER
Dailey and Tow, JJ., concur

Announced June 9, 2022

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith E. O'Harris, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Joseph Wayne Washington, appeals his convictions for second degree murder, ten counts of possession with intent to sell or distribute a controlled substance, tampering with a witness or victim, and violation of a protection order.

¶ 2    His only contention on appeal is that the trial court erred by trying the murder charge and the drug charges together.

¶ 3    We hold as a matter of first impression that *People v. Novotny*, 2014 CO 18, overruled *Norman v. People*, 178 Colo. 190, 496 P.2d 1029 (1972), to the extent *Norman* held joinder error requires automatic reversal.  Instead, we hold that misjoinder under Crim. P. 8(a)(2) is subject to harmless error review.

¶ 4    Reviewing for harmless error, we conclude that any joinder error was harmless, and we affirm.

I.    Relevant Facts and Procedural History

¶ 5    Evidence presented at trial allowed the jury to find the following facts.  Washington and his girlfriend attended a barbeque at Cherry Creek State Park hosted by Jason Pope.  Jackson Chavez and his ex-girlfriend, who were at the park with a different group, started to argue, and the fight turned physical.  Chavez's behavior made two of Pope's friends uncomfortable and upset, so they told

Pope and Washington about Chavez's behavior.  Pope's friends also told Pope that he should ask Chavez to leave.  Pope and Washington approached Chavez and asked him to leave.

¶ 6    Chavez threw a punch that "hit [Washington] and then clipped [Pope]."  Pope swung at Chavez and Chavez's return punch "knocked out" Pope.  Washington "turned around, walked maybe 20 feet away, . . . got a gun, and . . . turned around and shot [Chavez]" twice in the chest, killing him.  The gun was located in a brown backpack that Washington and his girlfriend brought with them to the barbeque.  After killing Chavez, Washington left the park with his girlfriend.

¶ 7    Washington and his girlfriend returned to his house in Aurora, where they packed two backpacks, including the brown backpack they had at the barbeque.  Washington's roommate testified at trial that he purchased drugs from Washington in the past and that he arranged for an Uber to take Washington and his girlfriend to downtown Denver.

¶ 8    Washington and his girlfriend went to Richard Giles' downtown apartment.  Giles booked Washington and Washington's girlfriend a hotel room for the night.  Washington gave Giles "like a

2

gram of cocaine or something and then they left." At trial, Giles testified that he previously purchased drugs from Washington.

¶ 9 The next morning, Raymond Wallace, another of Washington's friends, picked up Washington and Washington's girlfriend from the hotel and they went to a restaurant. After eating and having a few drinks, they drove to a gas station, where Washington was arrested for Chavez's murder.

¶ 10 The police obtained a search warrant for the vehicle in which Washington was seated when he was arrested. The police found two backpacks (including the brown backpack) in the backseat of the vehicle. When they searched the backpacks, the police found various drugs and drug paraphernalia. The police also obtained a search warrant for Washington's house, where they found more drugs and drug paraphernalia.

¶ 11 The prosecution charged Washington with first degree murder. The court issued a mandatory protection order prohibiting Washington from contacting or directly or indirectly communicating with his girlfriend. The prosecution later amended the complaint to include eleven counts of possession with intent to sell or distribute a controlled substance.

¶ 12    While in jail awaiting trial, Washington wrote a letter to his girlfriend and called her, discussing her communications with the police, his charges, and possible defenses. As a result of the letter and the jail calls, the prosecution charged Washington with violation of a protection order and tampering with a witness or victim.

¶ 13    Separately, Shamarr Long-Frazier, who was housed at the jail with Washington, told the prosecution that Washington told two other men at the jail that "he needed to get rid of [his girlfriend]." The prosecution further amended the complaint to include two counts of solicitation to commit murder in the first degree.

¶ 14    Before trial, Washington moved to sever, arguing both improper joinder under Crim. P. 8 and that he was entitled to relief from prejudicial joinder under Crim. P. 14.

¶ 15    The trial court ruled that joinder under Crim. P. 8(a)(2) was permissible because the charges were "all interrelated and interconnected in a number of ways." The trial court also denied Washington's discretionary request for severance under Crim. P. 14.

¶ 16    At trial, although Washington did not testify, his counsel argued that Washington shot Chavez in self-defense and defense of

4

others. Also through counsel, Washington claimed that the drugs did not belong to him. Washington's counsel admitted that Washington violated a protection order.

¶ 17    The jury convicted Washington of second degree murder, ten counts of possession with intent to sell or distribute a controlled substance, violation of a protection order, and tampering with a witness or victim. The jury acquitted Washington of first degree murder,[1] one count of possession with intent to sell or distribute a controlled substance, and the two solicitation to commit murder charges.

##    II.    Even if the Trial Court Erroneously Joined Washington's Charges Under Crim. P. 8(a)(2), Any Error was Harmless

¶ 18    Washington first argues that the trial court reversibly erred by joining his charges under Crim. P. 8(a)(2).

¶ 19    Crim. P. 8(a)(2) permits the joinder of two or more offenses in a single charging document if they "are of the same or similar

---

[1] The jury was instructed on second degree murder, a lesser included offense of first degree murder. Because the jury convicted Washington of second degree murder, it necessarily acquitted him of first degree murder. "By definition, a jury that finds a defendant guilty of a lesser included offense axiomatically acquits them of the greater offense." *People v. Viburg*, 2021 CO 81M, ¶ 21.

character or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." *See also Bondsteel v. People,* 2019 CO 26, ¶ 36.

¶ 20    Assuming solely for the purposes of this opinion that the trial court erroneously joined Washington's charges under Crim. P. 8(a)(2), we conclude that any such error was harmless.[2]

### A.    Misjoinder Under Crim. P. 8(a)(2) is Subject to Harmless Error Review

¶ 21    Washington argues that if the trial court erroneously joined his charges under Crim. P. 8(a)(2), he is entitled to automatic reversal.  We disagree.

¶ 22    In *Norman,* the Colorado Supreme Court concluded that joinder was improper under Crim. P. 8 and held that "[t]he refusal of the court to grant defendants' request for a severance for trial requires reversal for a new trial."  178 Colo. at 194, 496 P.2d at 1030.

---

[2] Because we assume that the trial court erroneously joined Washington's charges under Crim. P. 8(a)(2), we express no opinion regarding whether a claimed joinder error under Crim. P. 8(a)(2) is reviewed de novo or for an abuse of discretion.

¶ 23    More recently, however, in *Novotny*, ¶ 20, the Colorado

Supreme Court held that "only error rising to the level of structural

error necessarily requires reversal."  It also overruled its prior

"holdings to the contrary and conclude[d] that reversal of a criminal

conviction for other than structural error, in the absence of express

legislative mandate or an appropriate case specific,

outcome-determinative analysis, can no longer be sustained."  *Id.* at

¶ 27.

¶ 24    Based on this language, we conclude that *Novotny* overruled

*Norman* to the extent *Norman* held that a joinder error requires

automatic reversal.  The only remaining question is whether

misjoinder is structural error, requiring automatic reversal, or trial

error, subject to harmless error review.

¶ 25    Structural errors are constitutional "defects affecting the

framework within which the trial proceeds," and they require

automatic reversal because they defy analysis by harmless error

standards.  *People v. Vigil*, 127 P.3d 916, 929 (Colo. 2006) (quoting

*Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)); *accord Neder v.

United States*, 527 U.S. 1, 7 (1999).

¶ 26    Trial errors are errors that occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether [the error] was harmless . . . ." *Fulminante*, 499 U.S. at 307-08.

¶ 27    In *United States v. Lane*, the United States Supreme Court held that "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  474 U.S. 438, 446 n.8 (1986).  Based, in part, on this rationale, the Court held that misjoinder of defendants under Fed. R. Crim. P. 8 was subject to harmless error analysis and was not automatically reversible.  *Id.* at 449-50.

¶ 28    Washington is correct that the facts of *Lane* differ from the facts of this case because *Lane* involved the misjoinder of defendants, not the misjoinder of charges.  *Id.* at 442.  Nevertheless, relying on *Lane*, courts in other jurisdictions have uniformly held that misjoinder of charges is reviewed for harmless error.  *United States v. Shellef*, 507 F.3d 82, 100 (2d Cir. 2007); *United States v.*

8

*Jawara*, 474 F.3d 565, 579 (9th Cir. 2007); *Beltran v. State*, 566 So. 2d 792, 792 (Fla. 1990) ("[H]armless error may properly be applied to the misjoinder of offenses."); *Mitchell v. State,* 782 P.2d 1340, 1343 (Nev. 1989) ("Based on the reasoning of *Lane,* we believe that misjoinder of claims is also subject to harmless error analysis."); *Wright v. United States*, 510 A.2d 223, 224 (D.C. 1986); *State v. Leach,* 370 N.W.2d 240, 253 (Wis. 1985).

¶ 29    Other than *Norman,* on which Washington relies, the parties have not cited, nor are we aware of any contrary authority.

¶ 30    Applying the definitions of structural error and trial error discussed above and considering other courts' uniform resolution of this question, we hold that misjoinder under Crim. P. 8 is a trial error subject to harmless error review.

### B.    Any Error was Harmless

¶ 31    On harmless error review, we only "reverse the judgment of conviction if there is a reasonable probability that any error by the trial court contributed to [the defendant's] conviction." *People v. Monroe,* 2020 CO 67, ¶ 17.  "[T]he strength of the properly admitted evidence supporting the guilty verdict is clearly an 'important consideration' in the harmless error analysis." *Pernell v. People,*

9

2018 CO 13, ¶ 25 (quoting *Crider v. People*, 186 P.3d 39, 43 (Colo. 2008)).

¶ 32     Washington argues that any error under Crim. P. 8(a)(2) was not harmless because the evidence would not have been cross-admissible had the cases been tried separately. When evidence is cross-admissible, there is no prejudice in consolidating the cases. *Buell v. People*, 2017 COA 148, ¶ 16. But "joinder under Crim. P. 8(a)(2) does not always require the evidence of the respective incidents to be cross-admissible were there to be separate trials." *Bondsteel*, ¶ 44. Therefore, even if the evidence was not cross-admissible we are not precluded from concluding, under appropriate circumstances, that any error under Crim. P. 8(a)(2) was harmless.

¶ 33     Instead, for three reasons, we conclude that any error in joining Washington's charges under Crim. P. 8(a)(2) was harmless.

### 1. The Evidence that Washington Did Not Act in Self-Defense or Defense of Others and Was Guilty of the Drug Charges and Tampering with a Witness was Overwhelming

#### a. Self-Defense

¶ 34     As to the murder charge, Washington raised the affirmative defense of self-defense and defense of others. When an affirmative

defense is pleaded, that defense "effectively becomes an additional element," and the prosecution "bears the burden of proving beyond a reasonable doubt that the affirmative defense is inapplicable." *People v. Pickering*, 276 P.3d 553, 555 (Colo. 2011).

> [A] person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

§ 18-1-704(1), C.R.S. 2021.

> Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and:
> (a) The actor has reasonable ground[s] to believe, and does believe, that he or another person is in *imminent* danger of being killed or of receiving great bodily injury.

§ 18-1-704(2) (emphasis added).

¶ 35    The uncontested evidence demonstrated that Chavez punched Pope, "knocking him out," and that Washington may have also been struck by Chavez. But there was no evidence Chavez ever had a weapon, much less a deadly weapon. Nevertheless, Washington turned around, took approximately twenty steps away from Chavez,

retrieved a gun from his backpack, turned back around, walked back toward Chavez, and shot Chavez twice in the chest. At the time he was killed by Washington, Chavez was no longer punching, kicking, or otherwise harming or attempting to harm Pope (or anyone else). Put simply, this is overwhelming evidence that Washington did not act in self-defense or defense of others.

### b. Drug Charges

¶ 36 To convict a person of possession with intent to sell or distribute a controlled substance, the prosecution must prove beyond a reasonable doubt that the defendant knowingly possessed a controlled substance with intent to sell or distribute it. § 18-18-405(1)(a), C.R.S. 2021. A person acts knowingly with respect to his conduct when he is "aware that his conduct is of such nature." § 18-1-501(6), C.R.S. 2021.

¶ 37 At trial, Washington argued through counsel that the drugs did not belong to him. He pointed to evidence that his girlfriend carried the backpacks in which the police found the drugs and that he lived with roommates.

¶ 38 But the police also found drugs and indicia of distribution in Washington's bedroom. Washington's roommate and Giles testified

12

that they purchased drugs from Washington in the past. Giles testified that although Washington's girlfriend would sometimes carry the backpacks that contained the drugs, Washington always handled the drugs and the money. Washington's girlfriend further testified that she carried the backpacks because Washington told her to do so.

¶ 39 From the uncontested testimony and circumstances, we conclude that the evidence was overwhelming that Washington knowingly possessed the drugs the police found in his backpacks and house.

¶ 40 Regarding intent to sell or distribute, the police found scales, weights, and hundreds of new, unused small bags in the brown backpack and at Washington's house. The following table summarizes the evidence presented at trial regarding the drugs the police found in the backpacks and at Washington's house and their approximate value.

| Controlled Substance | Amount Found | Personal Dose | Approximate Value |
|---|---|---|---|
| Psilocyn | 379 grams | 0.5 gram | $1,895 |
| Methamphetamine | Multiple small bags of pills, weighing at least 80 grams | 1 gram | $6,840 |

| Controlled Substance | Amount Found | Personal Dose | Approximate Value |
|---|---|---|---|
| Cocaine | 62 grams | 1 gram | $4,960 |
| Methylenedioxyamphetamine (MDA) | 24.71 grams | 0.5 gram | $2,223 |
| Amphetamine | 49.5 tablets, weighing 11.76 grams | One to two pills | $4,955 |
| Gamma hydroxybutyrate (GHB) | 13.79 grams | 0.5 gram | $1,040 |
| Lysergic acid diethylamide (LSD) | 1.65 grams of LSD in dropper bottle and paper that tested positive for LSD | One centimeter by one centimeter paper square | Between $1,650 and $5,000 |
| Methylenedioxymethamphetamine (MDMA) | 6.86 grams in rock form; 5.87 grams in granular form | 0.5 gram | $1,018 |
| Morphine | Eighteen tablets, weighing 2.89 grams | One to three pills | $190 |
| Alprazolam | Forty-seven whole tablets and three partial tablets, weighing 9.7 grams | One to three pills | $100 |

¶ 41    The evidence demonstrated that Washington possessed hundreds of doses of at least ten different controlled substances with an approximate value of at least $24,000.  Accordingly, the

evidence that Washington knowingly possessed with the intent to sell or distribute these controlled substances was overwhelming.

### c. Tampering with a Witness or Victim

> (1) A person commits tampering with a witness or victim if he intentionally attempts without bribery or threats to induce a witness or victim or a person he believes is to be called to testify as a witness or victim in any official proceeding or who may be called to testify as a witness to or victim of any crime to:
>
> (a) Testify falsely or unlawfully withhold any testimony; or
>
> (b) Absent himself from any official proceeding to which he has been legally summoned; or
>
> (c) Avoid legal process summoning him to testify.

§ 18-8-707, C.R.S. 2021.

¶ 42    Washington's girlfriend testified that Washington told her "to act dumb" if he got caught.  From jail, Washington wrote his girlfriend a letter, saying,

> I don't know what all was said to you or what you may have said, but please keep everything to "I don't know" or "I don't recall."  At this point they are trying to use everything against me including you, so at this point no statement is the best statement!!!

¶ 43    Washington also called his girlfriend from jail.  All of these calls were recorded.  She informed Washington that she told the police everything.  Washington responded, "we're gonna have to work on that. . . .  [W]hatever light you paint me in will decide if I see you or anyone else again . . . .  [M]y life is in your hands."

¶ 44    Washington's girlfriend testified at trial as follows:

> [Prosecutor]: When the defendant -- after you tell him that you told the police everything you could and he said we're going to have to work on that, what did you take that to mean?
>
> [Washington's girlfriend]: To say less and act dumb.
>
> . . . .
>
> [Prosecutor]: When he's telling you on the call [it's] about how you explain it that matters, did you take that to mean that he wanted you to be truthful?
>
> [Washington's girlfriend]: No.
>
> . . . .
>
> [Prosecutor]: When he's talking about whatever light you paint me in will decide if I see you or anyone else again, you understand, did you take that to mean that he wanted you to tell the truth about what happened?
>
> [Washington's girlfriend]: No.

¶ 45     As noted above, Washington did not testify, and no witness or other evidence contradicted the girlfriend's testimony, the content of the letter, or the substance of the recorded calls.

¶ 46     We conclude that overwhelming evidence proved that Washington attempted to induce his girlfriend (a witness) to testify falsely or to unlawfully withhold testimony.[3]

     2.     The Trial Court Instructed the Jury to Consider the Evidence and Law Applicable to Each Count Separately

¶ 47     The trial court instructed the jury as follows:

> In this case a separate offense is charged against Joseph Washington in each count of the information. Each count charges a separate and distinct offense, and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count. The fact that you may find Mr. Washington guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged.
>
> Mr. Washington may be found guilty or not guilty of any one or all of the offenses charged.

---

[3] We do not address the strength of the evidence supporting Washington's conviction for violation of a protection order because, at trial, Washington's counsel admitted that Washington violated the protection order prohibiting him from contacting his girlfriend.

¶ 48    Absent evidence to the contrary, we presume the jury understood and followed the court's instructions.  *People v. Thornton*, 251 P.3d 1147, 1152 (Colo. App. 2010).

### 3.    The Jury Acquitted Washington of the Most Serious Charge of First Degree Murder

¶ 49    The jury acquitted Washington of two counts of solicitation to commit murder, one of the drug charges, and the most serious charge of first degree murder.  This split verdict demonstrates that the jury was able to consider the evidence and law applicable to each offense separately and reach a verdict based on those counts alone.  *See Martin v. People*, 738 P.2d 789, 795-96 (Colo. 1987) (holding that a split verdict is an indication that a trial error did not contribute to the jury's verdict); *see also People v. Daley*, 2021 COA 85, ¶ 97.

¶ 50    Despite all this, Washington argues that he was prejudiced by the trial court's failure to sever his charges because the joinder prevented him "from exercising his constitutional right to testify in support of his self-defense claim."

¶ 51    "Prejudice *may* develop when an accused wishes to testify on one but not the other of the two joined offenses which are clearly

18

distinct in time, place and evidence." *People v. Walker*, 189 Colo. 545, 550, 542 P.2d 1283, 1286 (1975) (quoting *Cross v. United States*, 335 F.2d 987, 989 (D.C. Cir. 1964)).  But the "moving party must make a 'convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.'"  *Id.* (quoting *Baker v. United States*, 401 F.2d 958, 944 (D.C. Cir. 1968)).

¶ 52    Washington failed both in his original motion and in his appellate brief to make the showing required by *Walker*, so we lack the necessary information to evaluate his claim.  For this reason alone, we reject this argument.

¶ 53    Washington also argues that juror questions during trial demonstrated that the jury was unable to separate the facts and legal principles applicable to each offense.  And he argues that this juror confusion was inevitable because the trial was complex — it lasted over a week and involved more than thirty witnesses.

¶ 54    But juror questions about whether Washington's girlfriend or Pope saw Washington dealing drugs did not demonstrate that the jury was confused about the charges.  Rather, these questions demonstrated that the jury was engaged in the trial and asking

19

relevant questions. "[J]uror questioning . . . increases juror attentiveness during trial." *Medina v. People*, 114 P.3d 845, 852 (Colo. 2005). And the mere fact that the trial was lengthy and involved multiple witnesses did not make this case so complex that reversal is required for the alleged misjoinder.

¶ 55 Instead, for all of the reasons articulated above, we conclude that there is no reasonable probability that any joinder error under Crim. P. 8(a)(2) contributed to Washington's convictions.

### III. Even if the Trial Court Abused its Discretion by Denying Washington's Motion to Sever Under Crim. P. 14, Any Error was Harmless

¶ 56 Washington next argues that, even if it was permissible for the trial court to join his charges under Crim. P. 8(a)(2), the trial court abused its discretion by denying his motion to sever under Crim. P. 14.

¶ 57 Just as we assumed solely for the purposes of this opinion that the trial court erroneously joined the murder and drug charges under Crim. P. 8(a)(2), we similarly assume that the trial court abused its discretion by denying severance under Crim. P. 14.

¶ 58    If the court abuses its discretion by denying a severance

motion under Crim. P. 14, we review for harmless error.  *People v.*

*Harris*, 2016 COA 159, ¶ 77.

¶ 59    The harm Washington claims from the alleged misjoinder

under Crim. P. 8(a)(2) is precisely the same harm he claims from

the trial court's alleged abuse of discretion in denying severance

under Crim. P. 14.  Accordingly, for the reasons discussed above,

we conclude that any abuse of discretion by denying Washington's

severance motion under Crim. P. 14 was harmless.

## IV.   Disposition

¶ 60    The judgment of conviction is affirmed.

JUDGE DAILEY and JUDGE TOW concur.